UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

FRANCISCO NUNEZ,

                                      Plaintiff,

          -against-

THE CITY OF NEW YORK, a municipal entity; Det.
DAMIAN DIEDRICK (Shield #923769), Det. CLIFF
ACOSTA (Shield #892718), Det. RENE NARVAEZ
(Shield #900942), Det. STEVE ALEJANDRO (Shield
#912873), and Lt. JOHN ROGAN (Shield #902945), in
their individual and official capacities; Assistant District
Attorney CLEOPATRA TAKANTZAS, in her individual
and official capacities;  ROBERT JOHNSON, District
Attorney, Bronx County, in his official capacity; and
"JOHN and/or JANE DOES" Nos. 1, 2, 3, etc. (whose
identities are unknown but who are known to be police
officers of the New York City Police Department);
"RICHARD and/or RACHEL ROES" Nos. 1, 2, 3, etc.
(whose identities are unknown but who are known to be
supervisory personnel of the New York City Police
Department), all of whom are sued individually and in
their official capacities,

                                      Defendants.
-------------------------------------------------------------- X



14 CV 4182

VERIFIED
COMPLAINT
AND JURY
DEMAND

**14-cv-4182(RJS)(SN)**

          Plaintiff FRANCISCO NUNEZ, by and through his attorneys Beldock Levine &

Hoffman LLP and London & Robin, for his complaint against the defendants named above

alleges as follows:

## PRELIMINARY STATEMENT

          1.          This is a civil rights action brought under 42 U.S.C. § 1983 for violations of

rights guaranteed to the Plaintiff by the Fourth and Fourteenth Amendments to the United States

Constitution, and for violations of the laws of the State of New York arising out of the wrongful

acts and omissions of the New York City Police Department (NYPD") and the Bronx County

District Attorney's Office ("District Attorney's Office") and certain of the employees and agents

of these offices, and against named individual employees and agents of these offices.

2.      The events that form the backdrop of this litigation arose on May 27, 2011, when

one of two persons discharged a gun into a crowd of people at 1171 Morrison Avenue causing

injury to two men and a five year old girl.  The police were under great pressure to solve this

high profile case that was widely reported in the media.  After almost two weeks of unsuccessful

attempts to determine the perpetrators of the May 27th shooting, defendants wrongfully arrested

plaintiff without probable cause and prosecuted him for those crimes. Plaintiff spent almost three

years in jail for crimes which should not have been charged against him and which he did not

commit.

3.      Plaintiff seeks (i) compensatory damages for loss of liberty, malicious

prosecution, physical injury, psychological and emotional distress, and other financial loss

caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or

reckless deviations from well-settled constitutional law; and (iii) such other and further relief,

including costs and attorneys fees, as this Court deems equitable and just.

<u>**JURISDICTION**</u>

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and

(4), as this action seeks redress for the violation of plaintiff's constitutional and civil rights.

5.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28

U.S.C. § 1367(a), over any and all state constitutional and common law claims that are so related

to the federal claims within the original jurisdiction of this Court that they form part of the same

case or controversy.

## VENUE

6.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to plaintiff's claims took place.

## JURY DEMAND

7.      Plaintiff demands a trial by jury in this action on each and every one of his claims for which jury trial is legally available.

## THE PARTIES

8.      Plaintiff FRANCISCO NUNEZ is a Hispanic male citizen of the United States of America. At all relevant times, he was and is currently domiciled in Bronx County, City and State of New York.

9.      Defendant CITY OF NEW YORK ("CITY") is and was, at all times mentioned, a municipal corporation organized according to the laws of the State of New York.

10.      The NEW YORK CITY POLICE DEPARTMENT ("NYPD") is an agency of defendant City charged with the mission to "enhance the quality of life in [New York City] by working in accordance with constitutional rights to enforce the laws…"[1]

11.      Defendants former or current NYPD DETECTIVES DAMIAN DIEDRICK (Shield #923769), CLIFF ACOSTA (Shield #892718), RENE NARVAEZ (Shield #900942), STEVE ALEJANDRO (Shield #912873), and LIEUTENANT JOHN ROGAN (Shield #915755) were, at all times relevant to the circumstances underlying the complaint, employees and agents of the NYPD. They are being sued in their individual and official capacities.

---

[1] NYPD Mission Statement, http://www.nyc.gov/html/nypd/html/administration/mission.shtml.

12.     Defendants JOHN and/or JANE DOES Nos. 1, 2, 3, etc., and RICHARD and/or RACHEL ROES Nos. 1, 2, 3, etc., were, at all times relevant to the circumstances underlying the complaint, police officers and/or supervisory personnel of the NYPD.  Their identities are as yet unknown to plaintiff.  They are being sued in their individual and official capacities.

13.     Defendant ROBERT JOHNSON is, at all times relevant to the circumstances underlying the complaint, employed by the CITY as the Bronx County District Attorney.  He is being sued in his official capacity.

14.     Defendant CLEOPATRA TAKANTZAS is, at all times relevant to the circumstances underlying the complaint, employed by the CITY as an Assistant District Attorney ("ADA") in Bronx County.  She is being sued in her individual and official capacities.

15.     At all times relevant to the circumstances underlying the complaint, upon information and belief, all police officer defendants were assigned to the 43rd Precinct, located in Bronx County, City and State of New York.

16.     At all times relevant to the circumstances underlying the complaint, and in all their actions described herein, all the individual defendants were acting under color of state law in the course and scope of their duties and functions as servants, employees and officers of either the NYPD or BRONX COUNTY DISTRICT ATTORNEY'S OFFICE and otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

## ADMINISTRATIVE PROCEEDINGS

17.     On June 10, 2014, within ninety (90) days after the claims herein sued upon arose, plaintiff caused his sworn notice of claim, in proper form, to be duly served upon defendant City.

Plaintiff will attend a hearing pursuant to section 50-h of the New York General Municipal Law when and if one is scheduled.

18.     This action has been commenced within one year ninety days after the causes of action set forth herein accrued and within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. §§ 1983.

## FACTUAL ALLEGATIONS

19.     The following factual allegations, except for plaintiff's allegations about himself and his conduct, are made upon information and belief based on official police, prosecution and court documents, records and transcripts of testimony, and on investigations by and/or under the supervision of Francisco Nunez's defense counsel in relation to the proceedings that led to dismissal of the charges.

20.     On the night of May 27, 2011, Brian Perez, Jonathan Baez, Hector Lopez-Vega, Carlos Almonte, Melanie Pacheco, and several other people were present on or about the sidewalk in front of 1171 Morrison Avenue, Bronx, New York.  Also present was Darlene Urena, a five year old girl.

21.     At approximately 10:12 p.m., two individuals convened across the street from 1171 Morrison Avenue.  One of the individuals shot a handgun approximately five times into the crowd in front of 1171 Morrison Avenue, while the other individual stood behind him.

22.     The people in front of 1171 Morrison Avenue immediately scrambled for cover when the gunshots were fired at them.

23.     The shooting lasted for only seconds.

24.     The individuals who had fired the shots immediately ran away from the scene, heading northbound on Morrison Avenue.

25.     Darlene Urena was struck in her lower abdomen by one of the gunshots.  Also shot were Jonathan Baez, who was hit in his upper left thigh, and Hector Lopez-Vega, who was hit in his right leg.

26.     Upon information and belief, Brian Perez immediately called 911 and reported that his friend (Hector Lopez-Vega) and a little girl had been shot.  When the 911 operator asked Perez where the shooter was, he responded that there were two men and that they had fled towards Westchester Avenue.  Perez additionally told the operator that both men had long hair.

27.     Police officers and ambulances soon arrived on the scene.

28.     The police ordered a level one mobilization. The crime scene was secured and police officers began canvassing the area for witnesses and the perpetrators.

29.     Upon information and belief, Lieutenant Rogan, the commanding officer of the 43rd Precinct Detective Squad, was giving out orders.

30.     A description of the perpetrators was obtained and broadcast over the police radio.  They were described as being two male Hispanics, approximately 5 feet 8 inches tall; one was said to be wearing a dark hooded sweatshirt with jeans, while the other was reported as wearing a grey sweater and jeans.  Both perpetrators were described as having long hair that was in a pony tail and no facial hair.

31.     Darlene Urena and Hector Lopez-Vega were taken to Jacobi Hospital, and Jonathan Baez was taken to St. Barnabas hospital.

32.     Hector Lopez-Vega and Jonthan Baez were soon determined to be in stable condition; by the early hours of May 28, 2011, Darlene Urena was reported to be in critical, but stable, condition.

33.     The police prepared individual complaint reports for Darlene Urena, Hector Lopez-Vega and Jonathan Baez.  Each of those complaint reports described the perpetrators as male Hispanics who had long hair that was in a pony tail.

34.     Upon information and belief, Detective Diedrick attempted to contact Brian Perez in the early hours of May 28, 2011, because Perez had called 911 immediately after the shooting and provided a description of the shooters.  Perez refused to talk to Detective Diedrick.

35.     Upon information and belief, the police talked to a Melanie Pacheco who had observed the two shooters.

36.     Ms. Pacheco was taken to the 43rd Precinct to look at mugshot photographs to try and identify the perpetrators of the shooting.  Ms. Pacheco picked out a photograph of Rafael Guzman.

37.     Rafael Guzman was later interviewed by the police and claimed to have been at his apartment on Harrod Avenue at the time of the shooting.

38.     The police also spoke to Carlos Almonte who had observed one of the shooters firing from his hip while the other person stood behind him.

39.     Upon information and belief, Detective Alejandro interviewed Jonathan Baez at St. Barnabas Hospital. Baez told the detective he had been playing basketball at the time of the shooting and that, when he heard the gunshots, he immediately ran into a barber shop and discovered that he had been shot in the leg.

40.     Upon information and belief, Detective Diedrick interviewed the police officer that had transported Jonathan Baez to the hospital who confirmed Baez's claim that he had been playing basketball at the time he was shot.

41.     Upon information and belief, Detectives Acosta and Narvaez interviewed Hector Lopez-Vega at Jacobi Hospital.

42.     The police suspected that the intended target was Hector Lopez-Vega and that the incident was likely gang related.

43.     On or about May 28, 2011, at approximately 12:20 a.m., Detective Narvaez conferred with the Bronx Gang Squad to determine if Hector Lopez-Vega was associated with any gangs with negative results.

44.     On or about May 28, 2011, at approximately 10:50 a.m., Detective Alejandro requested an "EAS Entity Search" of a complainant (presumably Hector Lopez-Vega).

45.     A crime scene unit eventually arrived at 1171 Morrison Avenue and processed the crime scene.

46.     Five nine millimeter bullet casings were recovered from the side of the street opposite 1171 Morrison Avenue.

47.     Ballistics tests were later performed on these bullet casings, which revealed that all five casings had been fired from the same gun.

48.     The May 27, 2011 shooting at 1171 Morrison Avenue immediately became a high profile case because of a five year old girl being shot and seriously injured and was widely reported in the media.

49.     The police spent several days canvassing the area around 1171 Morrison avenue for information about the May 27th shooting; while the police spoke to several people who had heard shots being fired that night, they purportedly did not obtain any further leads as to who the perpetrators were.

50.     The police obtained surveillance footage from 1155-1171 Morrison Avenue, which showed the persons in front of 1171 Morrison Avenue being shot at, but, upon information and belief, did not show the shooters.

51.     The police attempted to secure surveillance footage from cameras in the surrounding area that could have possibly recorded the May 27th shooters.

52.     Upon information and belief, the police also monitored social media in an attempt to obtain information on the May 27th shooting.

53.     Upon information and belief, information was posted on the internet indicating that the May 27th shooting was perpetrated by members of the Trinitarios gang who were shooting at members of their rival gang, Dominicans Don't Play.

54.     On May 30th and 31st, 2011, police officers began handing out and putting up "Help us" flyers in an attempt to obtain leads regarding the May 27th shooting at 1171 Morrison Avenue.  Upon information and belief; reward of $12,000 reward was offered for information leading to an arrest.

55.     On or about June 2, 2011, at approximately 1:30 a.m. at the 43rd Precinct, Brian Perez was shown a photo array prepared by Detective Acosta that contained a photograph of Ramon Ferreira.

56.     At that time, Brian Perez was on probation for a robbery conviction.

57.     According to the June 2, 2011 Photo Array Viewing Report, Brian Perez identified Ramon Ferreira as the May 27th shooter and claimed that Ferreira was "standing in front of the other guy shooting" and then pointed his gun at Perez and shot twice.

58.     Detective Acosta then issued an "I-Card" (or wanted card) for Ramon Ferreira.

9

59.     The application for the "I-card" stated that Ferreira was a member of the Trinitarios gang and had been identified as the shooter of three victims of the May 27th shooting, including a five year old girl.

60.     At approximately 1:30 p.m. on  June 2, 2011, Ramon Ferreira was taken into custody by a member of the Bronx Warrant Squad at the electrician's school he was then attending.

61.     Upon information and belief, Ferreira was taken to the 43rd Precinct where he was **interrogated by detectives about his alleged membership in the Trinitarios gang and alleged involvement in the May 27th shooting.**

62.     Upon information and belief, Ferreira told detectives that he was not a member of the Trinitarios gang, that he was not involved in the May 27th shooting, that he did not know who was involved in the May 27th shooting, and that he was home watching his little brother at the time of the shooting.

63.     Upon information and belief, on the night of June 2, 2011, Lieutenant Rogan and Detectives Diedrick, Narvaez, Alejandro and Acosta prepared a lineup with Ramon Ferreira in it to show witnesses at the 62nd Precinct.

64.     **Ramon Ferreira was not represented by a lawyer at the June 2, 2011 lineup.**

65.     At approximately 10:45 p.m., Melanie Pacheco observed the lineup including Ramon Ferreira and could not identify anyone.

66.     At approximately 10:50 p.m., Brian Perez observed the lineup including Ramon Ferreira and identified Ferreira as the person who was shooting at him.

67.     Upon information and belief, at approximately 10:55 p.m., Carlos Almonte observed the lineup including Ramon Ferreira and could not identify anyone.

68.     On or about June 8, 2011, at approximately 7:30 p.m. at the 43rd Precinct, Brian Perez was shown a photo array prepared by Detective Acosta, which contained an April 26, 2011 photograph of plaintiff Francisco Nunez.

69.     The photograph of plaintiff, which was taken on April 26, 2011, depicted plaintiff with a closely-cut, shaved Caesar style haircut and prominent, fully grown beard.

70.     According to the June 8, 2011 Photo Array Viewing Report, Brian Perez identified plaintiff as the May 27th shooter and indicated that plaintiff shot a gun with both hands.

71.     On June 10, 2011, at approximately 9:00 a.m., plaintiff arrived at Bronx Criminal Court at 265 East 161st Street, Bronx, New York, for a court appearance regarding his June 7, 2011 arrest for alleged criminal possession of marijuana.

72.     A photograph of plaintiff taken after his June 7, 2011 arrest depicted plaintiff with a closely-cut, shaved Caesar style haircut and prominent, fully grown beard.

73.     As plaintiff was going to his court appearance at the Bronx Criminal Court, he was approached by three detectives who asked plaintiff for his name.  Plaintiff responded he was Francisco Nunez.

74.     The detectives then told plaintiff to come with them because they wanted to ask him questions.

75.     After arriving at the 43rd Precinct, detectives began questioning plaintiff about the May 27th shooting.

76.     Plaintiff told detectives that all he knew about the May 27th shooting was what he had seen on the news and that he had been hanging out with his friends in a different neighborhood at the time of the shooting.

77.     Plaintiff was interrogated for several hours by several different detectives who took turns interrogating him.

78.     Some detectives told plaintiff that they knew he was not responsible for the May 27th shooting, that they only wanted the names of persons responsible for the shooting, and that they would let plaintiff go if he provided them with some names.

79.     Other detectives accused plaintiff of being one of the perpetrators to the May 27th shooting and told plaintiff that they had the other perpetrator in custody, that the other perpetrator had admitted to participating in the shooting, and that he had told detectives that plaintiff had perpetrated the shooting with him.

80.     These detectives additionally told plaintiff that they knew he was guilty, that he should admit his guilt, and that he would be going to jail for a long time.

81.     Plaintiff was shown a photograph of Ramon Ferreira, but did not then recognize him.

82.     When Detective Diedrick interviewed plaintiff, he got aggressive towards plaintiff and yelled at plaintiff that the girl that had been shot could have been his daughter.

83.     Detective Diedrick then physically abused plaintiff by grabbing him by the neck and throwing him against the wall several times.

84.     Plaintiff's interrogation lasted into the night and covered approximately 10 hours.

85.     During that time, plaintiff had one arm handcuffed to the wall.

86.     Although plaintiff was only wearing a t-shirt and basketball shorts, the room in which plaintiff was interrogated was kept freezing cold.

87.     During that time, plaintiff had asked to be able to call his family to notify them of his whereabouts, but detectives denied his requests.

88.     During that time plaintiff had also requested food and water, but detectives denied his requests.

89.     During that time, plaintiff had also requested to use the bathroom, but detectives denied his requests.

90.     According to a Lineup Administration Report, on June 10, 2011, plaintiff was placed in a lineup prepared by Detective Diedrick that was viewed by Brian Perez at approximately 7:45 p.m. when Perez identified plaintiff as the person from "the shooting on Morrison."

91.     Plaintiff was subsequently taken to Central Booking.

92.     Plaintiff eventually saw a lawyer who informed plaintiff that he was being charged with three attempted murders.

93.     When plaintiff was finally arraigned, he was denied bail and sent to Rikers Island.

94.     At Rikers Island, word spread that plaintiff was accused of shooting a five year old girl, after which plaintiff was treated abusively by prison guards and inmates as a result.

95.     On June 13, 2011, Ramon Ferriera testified before a grand jury and was examined by ADA Takantzas.

96.     Ferreira testified that he had no knowledge of the May 27th shooting and that he had been home watching his little brother at the time of the shooting.

97.     ADA Takantzas asked Ferreira if he hung out with any male friends that had long hair.  Ferreira said he did not.

98.     On or about June 15, 2011, plaintiff was indicted (Bronx County Indictment No. 1980/11), along with co-defendant Ramon Ferreira for four counts of attempted murder in the second degree, one count of attempted assault in the first degree, two counts of assault in the first

degree, five counts of assault in the second degree, and two counts of criminal possession of a weapon in the second degree.

99.     When plaintiff met Ferreira in court, he recognized Ferreira as someone he had attended Walton High School with in the Bronx approximately one and a half years earlier who did not know personally.

100.    Ferreira told plaintiff that he had no knowledge of the May 27th shooting and that he had never accused plaintiff of being responsible for the shooting.

101.    On or about July 16, 2011, Brian Perez was arrested for criminal possession of a weapon in the second degree; Perez was convicted of that charge on October 7, 2011.

102.    Brian Perez was released from custody on or about March 14, 2012.

103.    On or about March 30, 2012, plaintiff's defense counsel received information that Brian Perez wished to recant his identification of plaintiff for the May 27, 2011 shooting.  Foy then contacted ADA Takantzas and provided her with this information.

104.    On or about March 31, 2012, Foy spoke to Perez on the telephone and Perez confirmed for Foy that his identification of plaintiff as the May 27th shooter was not accurate or reliable.

105.    On or about April 5, 2012, Foy contacted ADA Takantzas and informed her of what he had learned from Perez.

106.    That same day, Foy began a bail hearing for plaintiff, after which the hearing was adjourned so that ADA Takantzas could investigate Foy's assertions regarding Brian Perez's recantation of his identification of plaintiff as the May 27th shooter.

107.    Plaintiff's bail hearing was resumed on May 11, 2012.

108.    At that hearing, Foy learned that ADA Takantzas had provided Judge Barrett with a confidential written submission regarding why the Bronx District Attorney's Office still had a viable case against plaintiff.  Plaintiff's bail application was then denied.

109.    On September 9, 2013, Brian Perez was arrested for criminal possession of marijuana and criminal possession of a controlled substance. Perez was released on his own recognizance the following day.

110.    Upon information and belief, on November 7, 2013, Brian Perez did not show up at his court appearance for the charges of criminal possession of marijuana and a controlled substance, and a warrant was issued for his arrest.

111.    On April 9, 2014, Brian Perez was arrested for an October 19, 2013 murder and for criminal possession of a loaded firearm, among other charges. Perez was indicted by a grand jury on these charges on May 9, 2014.

112.    On May 6, 2014, almost three years after his arrest, all charges against Francisco Nunez were dismissed by motion of the District Attorney.

### FIRST CAUSE OF ACTION
#### (Constitutional Violations -- 42 U.S.C. Sec. 1983)
#### Against the Individual Defendants

109.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

110.    On information and belief, defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. Sec 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

a.   freedom from unreasonable search and seizure of their persons and property;

b.   freedom from arrest without probable cause;

c.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, and of which wrongful detention plaintiff was aware and did not consent;

d.   freedom from the lodging of false charges against him by police officers, including on information and belief, by some or all of the individual defendants;

e.   freedom from malicious prosecution by police officers, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

f.   freedom from deprivation of liberty without due process of law; and

g.   equal protection, privileges and immunities under the law.

111.   The deprivation of plaintiff's federal constitutional rights resulted in the injuries and damages set forth above.

## SECOND CAUSE OF ACTION
### (Monell Claim Against Defendant City -- 42 U.S.C. Sec. 1983)

112.   Upon information and belief, supervisory officers and personnel sanctioned, ratified, allowed and/or acquiesced in the individual defendants' affirmative acts and participated in the aforementioned unlawful policies, customs and practices.

113.   Without limiting the foregoing, the individual defendants' wrongful conduct includes an institutional history, upon information and belief, in numerous cases known to their supervisory personnel in which, prior to and/or after arrest and prosecution, police officers and other law enforcement personnel were aware of exculpatory evidence that was not known to or disclosed to the accused and their counsel.

114.    Despite such knowledge of the wrongful conduct of police officers and other law enforcement personnel under their supervision, supervisory personnel, upon information and belief, (a) frequently failed to take corrective action to remedy the adverse affect on persons charged with crimes of the failure to disclose exculpatory evidence to the accused and their counsel; (b) frequently compounded such wrongful failures to disclose by allowing false and fraudulent statements and representations on the part of persons under their supervision to remain uncorrected; (c) frequently failed to discipline, train and instruct police officers and district attorneys to remedy such wrongful failures in order to fulfill their constitutional obligations and proper roles in the justice system; and (d) frequently tolerated rather than monitored and investigated such wrongful failures by police officers and assistant district attorneys.

115.    Further, in regard to the administrative and managerial functions of district attorneys and especially pertaining to obligations for disclosure to defense counsel in accordance with the standards of <u>Brady v. Maryland</u>, defendant City and supervisory personnel at the Office of the Kings County District Attorney evinced and followed a pattern of ignoring law enforcement improprieties and misconduct and a pattern of failure to train and supervise regarding disclosure obligations imposed by <u>Brady</u> and other legal obligations.

**THIRD CAUSE OF ACTION**
**(New York State Constitutional Violations)**
**Against the Individual Defendants**

116.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

117.    Such conduct breached the protections guaranteed to plaintiff by the New York State Constitution, including but not limited to, Article I, Secs. 6, 8, 11, and 12, and including the

following rights:

    a.   freedom from unreasonable search and seizure of his person and property;

    b.   freedom from arrest without probable cause;

    c.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, and of which wrongful detention plaintiff was aware and did not consent;

    d.   freedom from the lodging of false charges against him by police officers, including on information and belief, by some or all of the individual defendants;

    e.   freedom from malicious prosecution by police officers, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

    f.   freedom from deprivation of liberty without due process of law; and

    g.   equal protection, privileges and immunities under the law.

118.    The deprivation of plaintiff's rights under the New York State Constitution resulted in the injuries and damages set forth above.

**FOURTH CAUSE OF ACTION**
**(False Arrest)**
**Against the Individual Defendants**

119.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

120.    Acting under color of law, some of the individual defendants unlawfully arrested plaintiff without probable cause or other legal justification.

121.    Acting under color of law, some of the individual defendants caused and/or knowingly failed to prevent plaintiff's unlawful arrest.

122.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

123.    As a result, plaintiff suffered the injuries and damages set forth above.

124.    Additionally, defendants are liable for punitive damages.

**FIFTH CAUSE OF ACTION**
**(False Imprisonment)**
**Against the Individual Defendants**

125.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

126.    On information and belief, some of the individual defendants wrongfully detained plaintiff and deprived him of his liberty without good faith, reasonable suspicion or other legal justification.

127.    Plaintiff was conscious of, and did not consent to, his confinement.

128.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

129.    As a result, plaintiff suffered the injuries and damages set forth above.

130.    Additionally, defendants are liable for punitive damages.

**SIXTH CAUSE OF ACTION**
**(Malicious Prosecution)**
**Against the Individual Defendants**

131.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

132.    On information and belief, some of the individual defendants, acting under color of law, commenced and continued, and/or caused to be commenced and continued, criminal prosecution against plaintiff that were lacking in probable cause, instituted in malice, and which

19

ultimately terminated in plaintiff's favor.

133.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

134.    As a result, plaintiff suffered the injuries and damages set forth above.

135.    Additionally, defendants are liable for punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Assault and Battery)**
**Against the Individual Defendants**

136.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

137.    On information and belief, some of the individual defendants, without just cause, willfully and maliciously touched plaintiff without his authorization and caused plaintiff reasonably to fear use of physical force against him, causing plaintiff to suffer injury.

138.    The individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

139.    As a result, plaintiff suffered the injuries and damages set forth above.

140.    Additionally, defendants are liable for punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Infliction of Emotional Distress)**
**Against the Individual Defendants**

141.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

142.    The individual defendants' acts described above were punitive, extreme and outrageous.

143.    The individual defendants' acts described above were taken for no legitimate

purpose.

144.    On information and belief, in taking the actions described above, defendants intentionally, recklessly and/or negligently caused severe emotional distress to plaintiff.

145.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

146.    As a result, plaintiff suffered the injuries and damages set forth above.  Plaintiff has suffered and is continuing to suffer damages as set forth above.

147.    Additionally, defendants are liable for punitive damages.

## NINTH CAUSE OF ACTION
### (Harassment)
### Against the Individual Defendants

148.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

149.    On information and belief, the individual defendants, by their aforementioned acts, subjected plaintiff to a course of conduct which served no legitimate purpose and was meant solely to alarm and harm him.

150.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

151.    As a result, plaintiff suffered the injuries and damages set forth above.  Plaintiff has suffered and is continuing to suffer damages as set forth above.

152.    Additionally, defendants are liable for punitive damages.

## TENTH CAUSE OF ACTION
### (Negligence of the Individual Defendants)
### Against the Individual Defendants

153.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth

herein.

154.    On information and belief, the individual defendants, by their aforementioned acts, negligently failed to use due care in the performance of their duties in that they, among other negligent acts:

a.  failed to perform their duties as a reasonably prudent and careful police officer or supervisor would have done under similar circumstances;

b.  carelessly and recklessly seized and detained plaintiff;

c.  carelessly and recklessly arrested and detained plaintiff without a warrant or probable cause.

155.    The negligent actions of the individual defendants directly and proximately caused plaintiff's injuries and damages set forth above.

## ELEVENTH CAUSE OF ACTION
### (Respondeat Superior)
### Against defendant CITY OF NEW YORK

156.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

157.    Defendant CITY is liable for the actions of the individual defendants under the doctrine of respondeat superior.

158.    None of the individual defendants' actions described above were privileged or within the normal course of police activities.  None of the individual defendants is entitled to any immunity.

159.    Defendant CITY is liable for all damages incurred by plaintiff as a result of the individual defendants' actions described above.

**WHEREFORE**, plaintiff Francisco Nunez demands the following relief against all defendants, jointly and severally:

    a.  a judgment declaring the actions and conduct of defendants unconstitutional and unlawful under federal and state law;

    b.  expungement of all records relating to the plaintiff's arrests, including destruction of all photographs and fingerprints taken in connection with the arrests and prosecutions described above;

    c.  full and fair compensatory damages in an amount to be determined by a jury;

    d.  punitive damages in an amount to be determined by a jury;

    e.  reasonable attorneys' fees, expenses, costs and disbursements of this action;

    f.  pre- and post-judgment interest; and

    g.  such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 10, 2014

                    BELDOCK LEVINE & HOFFMAN LLP

                    By: _____
                    Myron Beldock
                    Marc A. Cannan
                    99 Park Avenue, Suite 1600
                    New York, New York 10016
                    (212) 490-0400

                    Avrom Robin
                    London & Robin
                    99 Park Avenue, Suite 1600
                    New York, New York 10016
                    (212) 683-8000

                    *Attorneys for Plaintiff*

## <u>VERIFICATION</u>

STATE OF NEW YORK    )
                       :      ss.:
COUNTY OF NEW YORK  )

FRANCISCO NUNEZ, being duly sworn, deposes and says:

Deponent is the plaintiff in the within action.  Deponent has read the foregoing Verified Complaint and Jury Demand and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

_Francisco Nunez_
Francisco Nunez

Sworn to before me this
10th day of January, 2014.

_____
Notary Public

MARC A. CANNAN
NOTARY PUBLIC, State of New York
No. 02CA6265836
Qualified in Queens County
Commission Expires 07/16/2018