**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

FRANCISCO NUNEZ,

                             Plaintiff,

       -against-

THE CITY OF NEW YORK, a municipal entity; Det.
DAMIAN DIEDRICK (Tax #923769), Det. CLIFF
ACOSTA (Tax #892718), Det. RENE NARVAEZ (Tax
#900942), Det. STEVE ALEJANDRO (Tax #912873),
and Lt. JOHN ROGAN (Tax #902945), in their
individual and official capacities; Assistant District
Attorney CLEOPATRA TAKANTZAS, in her individual
and official capacities;  ROBERT JOHNSON, District
Attorney, Bronx County, in his official capacity; and
"JOHN and/or JANE DOES" Nos. 1, 2, 3, etc. (whose
identities are unknown but who are known to be police
officers of the New York City Police Department);
"RICHARD and/or RACHEL ROES" Nos. 1, 2, 3, etc.
(whose identities are unknown but who are known to be
supervisory personnel of the New York City Police
Department), all of whom are sued individually and in
their official capacities,

                            Defendants.
-------------------------------------------------------------------- X

**14-CV-4182 (RJS)**

**FIRST AMENDED**
**COMPLAINT**

         Plaintiff FRANCISCO NUNEZ, by and through his attorneys Beldock Levine &

Hoffman LLP and London & Robin, for his first amended complaint against the

defendants named above, alleges as follows:

### PRELIMINARY STATEMENT

         1.      This is a civil rights action brought under 42 U.S.C. § 1983 for violations

of rights guaranteed to the Plaintiff by the Fourth and Fourteenth Amendments to the

United States Constitution, and for violations of the laws of the State of New York

arising out of the wrongful acts and omissions of the New York City Police Department

and the Bronx County District Attorney's Office ("BDAO") and certain named and unnamed employees and agents of those offices.

2.     The events that form the backdrop of this litigation arose on May 27, 2011, when one of two persons discharged a gun into a crowd of people in Bronx, New York, at 1171 Morrison Avenue causing injury to two men and a five year old girl. The police and BDAO were under great pressure to solve this high profile case that was widely reported in the media. After almost two weeks of unsuccessful attempts to determine the perpetrators, defendants wrongfully arrested plaintiff without probable cause and caused him to be incarcerated while he was prosecuted for those crimes. The charges against plaintiff were ultimately dismissed by motion of the BDAO and plaintiff was released. Plaintiff spent almost three years in jail for those charges which should not have been brought against him and which involved crimes which he did not commit.

3.     Plaintiff seeks (i) compensatory damages for loss of liberty, malicious prosecution, physical injury, psychological and emotional injuries, and financial loss caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including costs and attorney's fees, as this Court deems equitable and just.

## JURISDICTION

4.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of plaintiff's constitutional and civil rights.

5.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and common law claims that are so related to the federal claims within the original jurisdiction of this Court that form part of the same case or controversy.

## VENUE

6.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to plaintiff's claims took place.

## JURY DEMAND

7.      Plaintiff demands a trial by jury in this action on each and every one of his claims for which jury trial is legally available.

## THE PARTIES

8.      Plaintiff FRANCISCO NUNEZ ("plaintiff"/"Nunez") is a Hispanic male citizen of the United States of America.  At all relevant times, he was and is currently domiciled in Bronx County, City and State of New York.

9.      Defendant CITY OF NEW YORK ("CITY") is and was, at all times mentioned, a municipal corporation organized according to the laws of the State of New York.

10.      The NEW YORK CITY POLICE DEPARTMENT ("NYPD") is and was an agency of defendant City charged with the mission to "enhance the quality of life in [New York City] by working in accordance with constitutional rights to enforce the laws…"[1]

---

[1] NYPD Mission Statement, http://www.nyc.gov/html/nypd/html/administration/mission.shtml.

11.     Defendants former or current NYPD DETECTIVES DAMIAN

DIEDRICK (Tax #923769), CLIFF ACOSTA (Tax #892718), RENE NARVAEZ (Tax

#900942), STEVE ALEJANDRO (Tax #912873), and LIEUTENANT JOHN ROGAN

(Tax #915755) were, at all times relevant to the circumstances underlying the complaint,

employees and agents of the NYPD.  They are being sued in their individual and official

capacities.

12.     Defendants JOHN and/or JANE DOES Nos. 1, 2, 3, etc., and RICHARD

and/or RACHEL ROES Nos. 1, 2, 3, etc., were, at all times relevant to the circumstances

underlying the complaint, police officers and/or supervisory personnel of the NYPD.

Their identities are as yet unknown to plaintiff.  They are being sued in their individual

and official capacities.

13.     Defendant ROBERT T. JOHNSON was, at all times relevant to the

circumstances underlying the complaint, employed by the CITY as the Bronx County

District Attorney.  He is being sued in his official capacity.

14.     Defendant CLEOPATRA TAKANTZAS was, at all times relevant to the

circumstances underlying the complaint, employed by the CITY as an Assistant District

Attorney ("ADA") in Bronx County.  She is being sued in her individual and official

capacities.

15.     At all times relevant to the circumstances underlying the complaint, upon

information and belief, all police officer defendants were assigned to the 43rd Precinct,

located in Bronx County, City and State of New York.

16.     At all times relevant to the circumstances underlying the complaint, and in

all their actions described herein, all the individual defendants were acting under color of

state law in the course and scope of their duties and functions as servants, employees and officers of either the NYPD or BRONX COUNTY DISTRICT ATTORNEY'S OFFICE ("BDAO") and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

## ADMINISTRATIVE PROCEEDINGS

17.     On June 10, 2014, within ninety (90) days after the claims herein sued upon arose, plaintiff caused his sworn notice of claim, in proper form, to be duly served upon defendant City.  Plaintiff appeared and was questioned at an administration hearing pursuant to New York General Municipal Law §50-h on September 24, 2014.  The City and the New York City Comptroller have neglected and refused to adjust or pay plaintiff's claims.

18.     This action has been commenced within one year ninety days after the state causes of action set forth herein accrued.

## FACTUAL ALLEGATIONS

19.     The following factual allegations, except for plaintiff's allegations about himself and his conduct, are made upon information and belief, based on official police, prosecution and court documents, records and transcripts of testimony, and investigations by and/or under the supervision of Francisco Nunez's defense counsel in relation to the proceedings that led to the dismissal of the charges.

20.     On the night of May 27, 2011, Brian Perez, Jonathan Baez, Hector Lopez-Vega, Carlos Almonte, Melanie Pacheco, and several other people were present on or about the sidewalk in front of 1171 Morrison Avenue, Bronx, New York.  Also present was a five year old girl.

21.     At approximately 10:12 p.m., two individuals arrived across the street from 1171 Morrison Avenue.

22.     One of the individual shot a handgun approximately five times into the crowd in front of 1171 Morrison Avenue, while the other individual stood behind him.

23.     The people in front of 1171 Morrison Avenue immediately scrambled for cover when the gunshots were fired at them.

24.     The shooting was over within seconds.

25.     Upon information and belief, the shooter and his accomplice ran away from the scene, heading northbound on Morrison Avenue.

26.     The five year old girl was struck in her lower abdomen by one of the gunshots.  Also shot were Jonathan Baez, who was hit in his upper left thigh, and Hector Lopez-Vega, who was hit in his right leg.

27.     Upon information and belief, Brian Perez immediately called 911 and reported that his friend (Hector Lopez-Vega) and a little girl had been shot.  When the 911 operator asked Perez where the shooter was, he responded that there were two men and that they had fled towards Westchester Avenue.

28.     Perez additionally told the operator that both men had long hair.

29.     Police officers and ambulances soon arrived on the scene.  The police ordered a level one mobilization.  The crime scene was secured and the police officers began canvassing the area for witnesses and the perpetrators.

30.     Upon information and belief, Lieutenant John Rogan, the commanding officer of the 43rd Precinct Detective Squad, was in charge of the other officers and giving out orders.

31.     A description of the perpetrators was obtained and broadcast over the police radio.  They were described as being two male Hispanics, approximately 5 feet 8 inches tall, with one of them wearing a grey sweater and jeans.

32.     Both perpetrators were described as having long hair that was in a ponytail and no facial hair.

33.     The five year old girl and Hector Lopez-Vega were taken to the Jacobi Medical Center hospital, and Jonathan Baez was taken to St. Barnabus Hospital.

34.     Hector Lopez-Vega and Jonathan Baez were soon determined to be in stable condition.  By the early hours of May 28, 2011, the five year old girl was reported to be in critical, but stable, condition.

35.     Upon information and belief, the police talked to Melanie Pacheco who had observed the two shooters.

36.     Ms. Pacheco was taken to the 43rd Precinct to look at mugshot photographs to try and identify the perpetrators of the shooting.  Ms. Pacheco picked out a photograph of Rafael Guzman.

37.     Rafael Guzman was later interviewed by the police and claimed to have been in his apartment on Harrod Avenue at the time of the shooting.

38.     The police also spoke to Carlos Almonte who reported seeing one of the shooters firing from his hip while the other person stood behind him.

39.     Detectives Cliff Acosta ("Acosta") and Rene Narvaez ("Narvaez") interviewed Hector Lopez-Vega at the Jacobi Medical Center.

40.     Detective Steve Alejandro ("Alejandro") interviewed Jonathan Baez at St. Barnabus Hospital.  Jonathan Baez told the detective that he had been playing basketball

at the time of the shooting and that, when he heard the gunshots, he immediately ran into a barbershop and discovered that he had been shot in the leg.

41.     Detective Damian Diedrick ("Diedrick") interviewed the police officer that had transported Jonathan Baez to the hospital who confirmed that Baez claimed that he had been playing basketball at the time he was shot.

42.     Since Brian Perez had called 911 immediately after the shooting and provided a description of the shooters, Detective Diedrick attempted to contact Perez in the early hours of May 28, 2011.

43.     Diedrick reported that when he called Perez's cell phone number, the person answering the phone was uncooperative and refused to speak to him.

44.     Upon information and belief, Brian Perez accompanied Jonathan Baez to St. Barnabus Hospital.

45.     According to Brian Perez, police officers questioned him regarding what he knew about the shooting.

46.     Perez said he gave a female police officer at the hospital a description of the perpetrators, and the police officer wrote the description on her hand.

47.     Perez said he was then taken to the 43rd Precinct where he was further interrogated about the May 27, 2011 shooting for several hours.  While he was eventually allowed to return to his home, where he went to sleep, Perez said he awoke to police officers looking for him and who brought him back to the 43rd Precinct to continue investigating him.

48.     The police prepared individual complaint reports for each of the May 27, 2011 shooting victims: Jonathan Baez's complaint was assigned complaint number 2011-

043-07011, Hector Lopez-Vega's complaint was assigned complaint number 2011-043-07012, and the five year old girl's complaint was assigned complaint number 2011-043-07014.

49.     Each of those complaint reports described the perpetrators as two male Hispanics who had long hair that was in a ponytail.

50.     Upon information and belief, a complaint report would have also been prepared for Brian Perez's information under complaint number 2011-043-07013, and that complaint report also would have described the perpetrators as two male Hispanics with long hair that was in a ponytail.

51.     No police documents relating to complaint number 2011-043-07013 were ever produced to plaintiff.

52.     The police suspected that the intended target of the May 27th shooting was Hector Lopez-Vega and that the incident was likely gang related.

53.     On or about May 28, 2011, at approximately 12:20 a.m., Detective Narvaez conferred with the Bronx Gang Squad regarding the May 27, 2011 shooting.

54.     Members of the Bronx Gang Squad reported that Jonathan Baez was not in any of their gang related databases.

55.     No report of whether Hector Lopez-Vega or Brian Perez were part of any NYPD gang related database has ever been produced to plaintiff.

56.     Upon information and belief, on or about May 27, 2011, Brian Perez had a criminal record, was on probation for criminal possession of a weapon, and was a known member of the gang Dominicans Don't Play.

57.     On or about May 28, 2011, Detective Alejandro requested an "EAS Entity Search" of one of the complainants to the May 27th shooting.  Upon information and belief, an EAS (Entity Analytics Solutions) search is done through special software that allows police officers to perform searches based on persons, phone numbers, addresses, etc., against millions of NYPD records to determine relationships between information and networks of associates.

58.     The results of Detective Alejandro's May 28, 2011 EAS Entity Search request have never been produced to plaintiff.

59.     A crime scene unit eventually arrived at 1171 Morrison Avenue and processed the crime scene.

60.     Five nine millimeter bullet casings were recovered next to a grey BMW automobile that was parked opposite 1171 Morrison Avenue.

61.     Ballistics tests were later performed on these bullet casings, which revealed that all five casings were fired from the same gun.

62.     Crime scene investigators also found fingerprints on the driver's side fender and window of the grey BMW.

63.     No reports of any analysis or comparison of these fingerprints have ever been produced to plaintiff.

64.     The May 27, 2011 shooting at 1171 Morrison Avenue became a high profile case because of a five year old girl being shot, and was widely reported in the media.

65.     The police spent several days canvassing the area around 1171 Morrison avenue for any information about the May 27, 2011 shooting.

66.    While the police spoke to several people who had heard shots being fired that night, the complaint follow-up reports that the BDAO produced to plaintiff indicate the police did not obtain any further leads as to who the perpetrators were.

67.    The police attempted to secure surveillance footage from cameras in the surrounding area that could have possibly recorded the May 27th shooter and his accomplice.

68.    The police obtained surveillance footage from 1155-1171 Morrison Avenue, which showed the persons in front of 1171 Morrison Avenue being shot at, but did not show the shooter or his accomplice.

69.    Upon information and belief, police officers monitored social media in an attempt to find any information about the May 27th shooting.

70.    Information was posted on the internet claiming that the May 27th shooting was perpetrated by members of the Trinitarios gang who were shooting at members of their rival gang, Dominicans Don't Play.

71.    On May 30th and 31st, 2011, police officers began handing out and putting up "Help us" flyers in an attempt to obtain leads regarding the May 27th shooting.

72.    A reward of $12,000 was offered for information leading to the arrest of the perpetrators of the May 27th shooting.

73.    A copy of that flyer, which should have included a description of the perpetrators, has never been produced to plaintiff.

74.    According to Brian Perez, the police interrogated him about the May 27th shooting for multiple days and had him view photographs of suspects in an effort to get him to identify someone.

75.     No police documents regarding the interrogation of Brian Perez over multiple days were ever produced to plaintiff.

76.     According to Brian Perez, a friend named "Gringo" showed him photographs of plaintiff and Ramon Ferreira downloaded from Facebook and said that they were responsible for the May 27th shooting.

77.     According to Brian Perez, he did not know Ramon Ferreira or plaintiff and had never seen them before.

78.     While Brian Perez had described both of the May 27th perpetrators as having long hair, plaintiff, at all times relevant to the events described in this complaint, had a closely-cut, shaved Caesar style haircut and prominent beard.

79.     Police reports indicate that on June 2, 2011, at approximately 1:30 a.m., Brian Perez was shown a photo array prepared by Detective Acosta that contained a photograph of Ramon Ferreira.

80.     According to the June 2, 2011 Photo Array Viewing Report, Brian Perez identified Ramon Ferreira as the May 27th shooter and claimed that Ferreira was "standing in front of the other guy shooting" and then pointed his gun at Perez and shot twice.

81.     Detective Acosta then issued an "I-Card" (or wanted card) for Ramon Ferreira.  The application for the "I-Card" stated that Ferreira was a member of the Trinitarios gang and had been identified as the shooter of the three victims in the May 27th shooting, including a five year old girl.

82.     At approximately 1:30 p.m. on June 2, 2011, Ramon Ferreira was taken into custody by a member of the Bronx Warrant Squad at the electrician's school he was then attending.

83.     Ferriera was taken to the 43rd Precinct where he was interrogated by detectives about his alleged membership in the Trinitarios gang and alleged involvement in the May 27th shooting.

84.     Upon information and belief, detectives questioned Ferriera about a picture he had posted on Facebook in which he was making a gesture with his hand that was purportedly a Trinitarios gang sign.

85.     Upon information and belief, Ferreira told detectives that the hand gesture he made in the photo was commonly made by non-gang members, that he was not a member of the Trinitarios gang, that he was not involved in the May 27th shooting, that he did not know who was involved in the May 27th shooting, and that he was home watching his little brother at the time of the shooting.

86.     On the night of June 2, 2011, Lieutenant Rogan and Detectives Diedrick, Narvaez, Alejandro and Acosta arranged a lineup containing Ramon Ferreira and five police officers to show witnesses at the 62nd Precinct.

87.     At approximately 10:45 p.m., Melanie Pacheco observed the lineup containing Ramon Ferreira and could not identify anyone.

88.     At approximately 10:50 p.m., Brian Perez observed the lineup including Ramon Ferreira and identified Ferriera as the person who shot at him on May 27, 2011.

89.     Upon information and belief, at approximately 10:55 p.m., Carlos Almonte observed the lineup including Ramon Ferreira and could not identify anyone.

90.     By June 3, 2011, ADA Cleopatra Takantzas ("Takantzas") and/or other members of the BDAO were involved in the investigation of the May 27th shooting.

91.     On June 3, 2011, Ramon Ferreira was interrogated by ADA Takantzas and/or other members of the BDAO.

92.     During that interrogation, Ferreira was asked whether he committed the May 27th shooting.  Ferreira maintained his innocence of that crime.

93.     Although plaintiff did not match any of the descriptions that witnesses had given of the May 27th perpetrators, the ADA asked Ferreira if he associated with plaintiff.

94.     Ferreira responded that although he knew who plaintiff was, he did not know plaintiff personally or associate with him.

95.     Police reports indicate that on or about June 8, 2011, at approximately 7:30 p.m. at the 43rd Precinct, Brian Perez was shown a photo array prepared by Detective Acosta, which contained an April 26, 2011 police photograph of plaintiff.

96.     The photograph depicted plaintiff with a closely-cut, shaved Caesar style haircut and prominent, fully grown beard.

97.     According to the June 8, 2011 Photo Array Viewing Report, Brian Perez identified plaintiff as the May 27th shooter and indicated that plaintiff shot a gun with both hands.

98.     On June 10, 2011, at approximately 9:00 a.m., plaintiff arrived at Bronx Criminal Court at 265 East 161st Street, Bronx, New York, for a court appearance regarding his June 7, 2011 arrest for alleged criminal possession of marijuana.

99.     A police photograph of plaintiff taken after his June 7, 2011 arrest depicted plaintiff with a closely-cut, shaved Caesar style haircut and prominent, fully grown beard.

100.    As plaintiff was going to his court appearance at the Bronx Criminal Court, he was approached by three detectives who asked plaintiff for his name.  Plaintiff responded that his name was Francisco Nunez.

101.    The detectives then told plaintiff to come with them because they wanted to ask him questions.

102.    After arriving at the 43rd Precinct, detectives began questioning plaintiff about the May 27th shooting.

103.    Plaintiff told detectives that all he knew about the May 27th shooting was what he had seen on the news and that he had been hanging out with his friends in a different neighborhood at the time of the shooting.

104.    Plaintiff was interrogated for several hours by several different detectives who took turns interrogating him.

105.    Some detectives told plaintiff that they knew he was not responsible for the May 27th shooting, that they only wanted the names of persons responsible for the shooting, and that they would let plaintiff go if he provided them with some names.

106.    Other detectives accused plaintiff of being one of the perpetrators of the May 27th shooting and told plaintiff that they had the other perpetrator in custody, that the other perpetrator had admitted to participating in the shooting, and that he had told detectives that plaintiff had perpetrated the shooting with him.

107.    These detectives additionally told plaintiff that they knew he was guilty, that he should admit his guilt, and that he would be going to jail for a long time.

108.    Plaintiff was shown a photograph of Ramon Ferreira, but did not then recognize him.

109.    When Detective Diedrick interviewed plaintiff, he got aggressive and yelled at plaintiff that the girl who had been shot could have been his daughter.

110.    Detective Diedrick then physically abused plaintiff by grabbing him by the neck and throwing him against the wall several times.

111.    Plaintiff's interrogation lasted into the night and covered approximately 10 hours.

112.    During that time, plaintiff had one arm handcuffed to the wall.

113.    Although plaintiff was only wearing a t-shirt and basketball shorts, the room in which plaintiff was interrogated was kept freezing cold.

114.    During that time, plaintiff had asked to be able to call his family to notify them of his whereabouts, but detectives denied his requests.

115.    During that time plaintiff had also requested food and water, but detectives denied his requests.

116.    During that time, plaintiff had also requested to use the bathroom, but detectives denied his requests.

117.    According to a Lineup Administration Report, on June 10, 2011, plaintiff was placed in a lineup arranged by Detective Diedrick that was viewed by Brian Perez at approximately 7:45 p.m. and Perez identified plaintiff as the person from "the shooting on Morrison."

118.     Plaintiff has never received any documents indicating that Melanie Pacheco or Carlos Almonte were ever asked to or did view a lineup containing plaintiff.

119.     Plaintiff was subsequently taken to Central Booking.

120.     Plaintiff eventually saw a lawyer who informed plaintiff that he was being charged with three attempted murders.

121.     When plaintiff was finally arraigned, he was denied bail and sent to Rikers Island.

122.     At Rikers Island, word spread that plaintiff was accused of shooting a five year old girl, which resulted in plaintiff being treated abusively by prison guards and inmates.

123.     On or about June 13, 2011, the BDAO only presented their case against Ramon Ferreira to the Grand Jury.

124.     The BDAO did not then present their case against plaintiff to the Grand Jury – presumably, plaintiff contends, they realized the only evidence they had against plaintiff was the word of an unreliable criminal and gang member whose identification of plaintiff contradicted his earlier description of the perpetrators of the May 27th shooting.

125.     On June 13, 2011, Ramon Ferriera testified before a grand jury and was examined by ADA Takantzas.

126.     Ferreira testified that he had no knowledge of the May 27th shooting and that he had been home watching his little brother at the time of the shooting.

127.     Indicative of her awareness that plaintiff did not match any of the descriptions of the May 27th shooter or his accomplice, ADA Takantzas asked Ferreira if he hung out with any male friends that had long hair.  Ferreira said he did not.

128.     On or about June 15, 2011, Ramon Ferreira was indicted by the Grand Jury (Bronx County Indictment No. 1980/11).

129.     On or about June 17, 2011, ADA Takantzas provided plaintiff's defense counsel with a Voluntary Disclosure Form.  In that document, ADA Takantzas acknowledged her awareness of her obligation under *Brady v. Maryland* to disclose any exculpatory material regarding plaintiff in the BDAO's possession and/or that came into its possession.

130.     On or about July 16, 2011, Brian Perez was arrested for criminal possession of a weapon in the second degree.  Perez was convicted of that charge on October 7, 2011.

131.     On or about August 16, 2011, Jason Foy ("Foy") was assigned to take over the role of plaintiff's defense counsel.

132.     On or about the time he became plaintiff's defense counsel, Foy learned from plaintiff's prior defense counsel that the BDAO had failed to provide any discovery in plaintiff's case.

133.     On or about August 18, 2011, Foy wrote the Bronx District Attorney's Office and requested that, pursuant to the Bronx County District Attorney's Office voluntary discovery procedure, they provide him with all available discovery, including police reports and written statements.  Foy additionally requested that, in the event there was some legal reason the BDAO could not comply with his request, he be notified in writing.

134.     On or about September 6, 2011, Foy emailed members of the BDAO and again requested that they provide him with discovery.

135.    On or about September 7, 2011, the BDAO presented their case against Nunez to the Grand Jury.  Plaintiff was indicted (Bronx County Indictment No. 1980/11) for four counts of attempted murder in the second degree, one count of attempted assault in the first degree, two counts of assault in the first degree, five counts of assault in the second degree, and two counts of criminal possession of a weapon in the second degree.

136.    Upon information and belief, the only information presented to the grand jury connecting plaintiff to the May 27th shooting was the testimony of Brian Perez identifying plaintiff as one of the perpetrators of that crime.

137.    ADA Takantzas did not inform the grand jury that Brian Perez had originally described the May 27th shooter and his accomplice as having long hair.  Nor did ADA Takantzas inform the grand jury that Brian Perez only departed from his original description of the May 27th perpetrators after days of police interrogation.  Nor did ADA Takantzas inform the grand jury that before he identified plaintiff, Brian Perez had been given a picture of plaintiff by a friend who told Perez that plaintiff was responsible for the May 27th shooting.

138.    When plaintiff met Ferreira in court, he recognized Ferreira as a person with whom he had attended Walton High School in the Bronx approximately one and a half years earlier who he did not know personally.

139.    Ferreira told plaintiff that he had no knowledge of the May 27th shooting and that he had never accused plaintiff of being responsible for the shooting.

140.    On September 9, 2011, Foy made an oral request to the BDAO to provide him with discovery.

141.    On or about September 14, 2011, the BDAO served plaintiff's defense counsel with a Notice of Readiness for trial.

142.    On September 19, 2011, Foy wrote to the BDAO again requesting discovery because he had not gotten any response to his prior requests.

143.    On December 9, 2011, Foy served an Omnibus Motion upon the BDAO. In that motion, Foy asked for an order directing the Bronx County District Attorney to provide the discovery that he had requested under the BDAO's voluntary disclosure plan and for the BDAO to provide him with unredacted copies of police reports which may tend to exculpate his client either by an indication of his innocence or by impeachment of a prosecution witness under *Brady*.

144.    Foy additionally requested the suppression of the testimony identifying Nunez as one of the perpetrators to the May 27th shooting, or, alternatively, a *Wade/Dunnaway* hearing.

145.    In a response dated December 30, 2011, ADA Takantzas stated that the identification of Nunez occurred without any "police suggestivity" based on a photo array followed by a proper police line-up.

146.    Upon information and belief, Brian Perez was released from custody on or about March 14, 2012.

147.    On or about March 30, 2012, plaintiff's defense counsel, Jason Foy, received information that Brian Perez wished to recant his identification of plaintiff as one of the May 27, 2011 shooters.  Foy then contacted ADA Takantzas and provided her with this information.

148.     On or about March 31, 2012, Foy spoke to Perez on the telephone and Perez confirmed for Foy that his identification of plaintiff as the May 27th shooter was not accurate or reliable.

149.     On or about April 5, 2012, Foy contacted ADA Takantzas and informed her of what he had learned from Perez.

150.     That same day, Foy began a bail hearing for plaintiff before Judge Steven Barrett and raised the issue of Brian Perez's recantation of his identification of plaintiff as one of the perpetrators of the May 27th shooting.

151.     Based on ADA Takantzas's argument at the bail hearing, Foy believed that the BDAO had not conducted any investigation or followed up with Brian Perez regarding the information that Foy had provided her about Perez's recantation.

152.     Foy requested that Judge Barrett direct ADA Takantzas to immediately provide Foy with all outstanding discovery and *Brady* material regarding plaintiff's case. Judge Barrett granted Foy's request.

153.     Plaintiff's bail hearing was then adjourned so that ADA Takantzas could investigate Foy's assertions regarding Brian Perez's recantation of his identification of plaintiff as one of the perpetrators of the May 27th shooting.

154.     On April 6, 2012, Foy wrote ADA Takantzas requesting that she comply with Judge Barrett's direction to provide him immediately with all outstanding discovery and *Brady* material.  Foy additionally requested that ADA Takanntzas preserve all handwritten notes and reports generated as a result of her investigation of Brian Perez's recantation.

155.     Plaintiff's bail hearing was resumed on May 11, 2012.

156. At that hearing, Foy learned that ADA Takantzas had provided Judge Barrett with a confidential written submission as to why the Bronx District Attorney's Office still had a viable case against plaintiff.

157. Plaintiff has never been provided with a copy of ADA Takantzas's confidential written submission. Nor has plaintiff ever been informed of the contents of that submission.

158. Plaintiff's bail application was then denied.

159. Upon information and belief, on or about February 20, 2013, plaintiff was assaulted by inmates and Corrections officers at Rikers Island and suffered multiple fractures to his face, among other injuries.

160. On September 9, 2013, Brian Perez was arrested for criminal possession of marijuana and criminal possession of a controlled substance. Perez was released on his own recognizance the following day.

161. Upon information and belief, on November 7, 2013, Brian Perez did not show up at his court appearance for the charges of criminal possession of marijuana and a controlled substance, and a warrant was issued for his arrest.

162. On April 9, 2014, Brian Perez was arrested for an October 19, 2013 murder and for criminal possession of a loaded firearm, among other charges. Perez was indicted by a grand jury on those charges on May 9, 2014. Upon information and belief, those charges are still pending.

163. On May 6, 2014, almost three years after his arrest, all charges against Francisco Nunez were dismissed by motion of the District Attorney.

**FIRST CAUSE OF ACTION**
**(Constitutional Violations -- 42 U.S.C. Sec. 1983)**
**Against the Individual Defendants**

164.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

165.    On information and belief, defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. Sec. 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

   a.   freedom from unreasonable search and seizure of his person and property;

   b.   freedom from arrest without probable cause;

   c.   freedom from the use of excessive force;

   d.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, and of which wrongful detention plaintiff was aware and did not consent;

   e.   freedom from the lodging of false charges against him by police officers and prosecutors, including on information and belief, by some or all of the individual defendants;

   f.   freedom from malicious prosecution by police officers and prosecutors, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

   g.   freedom from deprivation of liberty without due process of law; and

h.   rights to equal protection, privileges and immunities under the law.

166.   The deprivation of plaintiff's federal constitutional rights resulted in the injuries and damages set forth above.

## SECOND CAUSE OF ACTION
### (*Monell* Claim -- 42 U.S.C. Sec. 1983)
### Against Defendant City of New York

167.   Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

168.   The City of New York directly caused the constitutional violations suffered by plaintiff, and is liable for the damages he suffered as a result of the conduct of the BDAO and defendant ADA Takantzas and such other Assistants who may have been involved.  The conduct of the BDAO and ADA Takantzas was a direct consequence of policies and practices of the City of New York.

169.   At all times relevant to this complaint, defendant City of New York, acting through the BDAO, had in effect policies, practices, customs, and usages that condoned and fostered the unconstitutional conduct of ADA Takantzas, and were a direct and proximate cause of the damages and injuries complained of herein.

170.   The policies, practices, customs, and usages of the City of New York, through the BDAO, included, *inter alia*, encouraging and/or tacitly sanctioning and/or failing to prevent and correct and failing to discipline prosecutor misconduct in attempting to secure and securing convictions in violation of individuals' state and federal constitutional rights, including, without limitation, rights to due process of law, to fair trial and to not be unlawfully seized, prosecuted, and deprived of liberty, through:

a. The failure to make timely and complete disclosure under *Brady* of evidence and information favoring the criminal defendant;

b. The failure to refrain from making false, inaccurate, incomplete, or misleading statements and argument to the criminal defendant and the court and the failure to timely correct such false or misleading statements and argument;

c. The failure to timely dismiss a prosecution once it became apparent that the case was built on false, inaccurate, incomplete, or misleading information.

171.    For example, defendant ADA Takantzas failed to carry out her obligation under *Brady* to disclose exculpatory information, including that Brian Perez, a known criminal and gang member, was the 911 caller who identified the May 27th shooter and his accomplice as both having long hair, and that Brian Perez did not identify plaintiff as one of the perpetrators of the May 27th shooting until someone suggested plaintiff was one of them and showed him a picture of plaintiff, as well as other information in the BDAO's and police possession that indicated and/or revealed Brian Perez was a false and unreliable witness.

172.    In spite of the unreliability of the only evidence connecting plaintiff to the May 27th shooting, ADA Takantzas went forward with plaintiff's prosecution.  Based on her inaccurate and incomplete representations, the Grand Jury chose to indict plaintiff and the court set prohibitively high bail causing plaintiff to be incarcerated while he awaited trial.  Even when Brian Perez came forward to recant his identification of plaintiff, ADA Takantzas continued to withhold evidence of Perez's unreliability and

maintained that she still had a viable case against plaintiff. It was not until plaintiff had served almost three years in jail, by which time Perez was indicted for a different murder, that ADA Takantzas finally conceded that she had no case against plaintiff and had all charges against him dismissed.

173. The existence of these unconstitutional policies, practices, customs, and usages is evidenced by similar occurrences of prosecutorial misconduct by the Bronx County District Attorney's Office reported to have taken place in or about the same time as plaintiff's prosecution and for a period of earlier years.

174. In a case very on point with plaintiff's, *People v. Segunda*, a Bronx County District Attorney caused a defendant in a rape prosecution to serve eight months in jail before turning over material evidence of the defendant's innocence – notes from the prosecution's case file showing that the complainant/victim had told an investigator that she had not been raped, but had engaged in consensual sex for money. Kate Pastor, *Bronx DAs Face Scorn, But Not Discipline*, City Limits (June 12, 2014), at 2-3, copy attached hereto as Exhibit A. When the judge learned of this egregious *Brady* violation, he reprimanded the ADA, telling her that the conduct of her and her office was "an utter and complete disgrace…," and banned her from his court room. *Id.*; Excerpt from March 21, 2014 transcript in *People v. Segunda* at 19-21, copy attached hereto as Exhibit B. When asked about the incident, then Bronx County District Attorney spokesperson Steven Reed excused the Brady violation claiming the information "was not prominent in the file," and added "[w]e see no reason to discipline anyone." *Bronx DAs Face Scorn, supra* at 3. Significantly, this occurred on March 21, 2014 – just a month and a half before the case against plaintiff was dismissed.

175.     In another contemporaneous case on point with plaintiff's, *People v. Kalief Browder*, a defendant served over three years in jail on charges for robbery, grand larceny, and assault before the Bronx County District Attorney dismissed the charges purportedly because the sole witness/complainant had left the country.  *See gen.* Jennifer Gonnerman, *Before the Law*, New Yorker (Oct. 6, 2014), copy attached as Exhibit C. Browder has since filed a civil lawsuit against the Bronx County District Attorney (and others) alleging, *inter alia*, that the Bronx County District Attorney's Office prolonged defendants' case by seeking long, undue adjournments to pressure the defendant into accepting a guilty plea.  *Id.* at 19-20.  When asked about the case, Bronx County District Attorney Robert T. Johnson stated: "These long delays – two, three years – they're horrendous, but the D.A. is not really accountable for that delay," *id* at 20.

176.     The policymakers of the City of New York, through the Bronx County District Attorney's Office, had knowledge of the propensity of defendant ADA Takantzas and other assistant district attorneys to engage in the type of prosecutorial misconduct alleged herein.  As evidenced by the numerous following reported cases, the Bronx County District Attorney's Office has a longstanding and persistent problem with its attorneys engaging in prosecutorial misconduct about which it has failed to train and discipline its attorneys and has been deliberately indifferent:

> *People v. Castro*, 147 A.D.2d 410 (1st Dep't 1989): Hearing on § 440.10 motion ordered where co-defendant, unbeknownst to defendant at trial, provided information to prosecution.

> *People v. Okafor*, N.Y.L.J. 9/8/89 at p. 21: *Rosario* and *Brady* violations found and conviction reversed where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

*People v. Olmo*, 153 A.D.2d 252 (1st Dep't 1989): New *Wade* hearing ordered where it was discovered that key witness gave perjured testimony and the prosecutor may have known about it.

*People v. Roman*, 150 A.D.2d 252 (1st Dep't 1989): Conviction reversed where prosecutor's improprieties on summation including, among other things, his attempt to give legal instruction to the jury, and his improper vouching for his own witnesses.

*People v. Negron*, 161 A.D.2d 537 (1st Dep't 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation accusing defendant and his counsel of fabricating theory of defense.

*People v. World*, 157 A.D.2d 567 (1st Dep't 1990): Conviction reversed where prosecutor denigrated defense theory of self-defense, accused defendant of lying and tailoring his testimony to appear less culpable, suggested that defendant was not entitled to fair trial, and improperly vouched for credibility of eyewitnesses.

*People v. Jorge*, 171 A.D.2d 498 (1st Dep't 1991): Conviction reversed for improper summation based on prosecutor's inflammatory comments.

*People v. McReynolds*, 175 A.D.2d 31 (1st Dep't 1991): Conviction reversed based on prosecutor's improper impugning of defense counsel's comments.

*People v. Butler*, 185 A.D.2d 141 (1st Dep't 1992): Conviction reversed where prosecutor's summation was found to violate the Code of Professional Responsibility.

*People v. Hernandez*, 185 A.D.2d 147 (1st Dep't 1992): Conviction affirmed, but prosecutor admonished regarding his summation and directed to receive training in order to refrain from future improper conduct.

*People v. Lewis*, 174 A.D.2d 294 (1st Dep't 1992): Conviction reversed where prosecutor failed to disclose deal made with different prosecutor in another city; misled the jury that no promises were made.

*People v. Mudd*, 184 A.D.2d 388 (1st Dep't 1992): Conviction reversed for numerous reasons, including the prosecutor's summation which was "directly contrary to the evidence."

*People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized the police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite the fact that complainants were also Bronx police officers.

*People v. Shears*, 184 A.D.2d 357 (1st Dep't 1992): Conviction affirmed where prosecutor improperly characterized defendant as a "magician," and improperly impugned defense witness's motives.

*People v. Banfield*, 194 A.D.2d 330 (1st Dep't 1993), and *People v. Byfield*, 194 A.D.2d 331 (1st Dep't 1993): Convictions reversed where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants.

*People v. Slaughter*, 189 A.D.2d 157 (1st Dep't 1993): Conviction reversed where, among other things, prosecutor improperly vouched for witnesses during summation.

*People v. LaFontaine*, 163 Mic. 2d 83 (Sup Ct. Bronx County 1994): The court took an adverse inference against the prosecutor as a sanction for his failure to provide *Rosario* materials to defendant.

*People v. White*, 200 A.D.2d 351 (1st Dep't 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

*People v. Ramos*, 201 A.D.2d 78 (1st Dep't 1994): Conviction reversed for prosecutor's failure to turn over *Brady* material related to credibility of complaining witness in child abuse case.

*People v. Rutter*, 202 A.D. 123 (1st Dep't 1994) and *People v. Bowen*, 234 A.D.2d 161 (1st Dep't 1996): Convictions

reversed because, among other things, the prosecutor failed to disclose a transcript of a polygraph exam performed on the People's main witness containing both exculpatory and impeachment material.

*People v. Deery*, 165 Misc.2d 319 (Crim. Ct. Bronx County 1995): The court granted defendant's motion to preclude the testimony of the complainant in an assault case because the state, in violation of *Rosario*, did not turn over the tape recording of a 911 call that was the basis for the testimony.

*People v. Johnson*, 212 A.D.2d 362 (1st Dep't 1995), Conviction affirmed, but court found summation "improper," as the prosecutor's comments were "misleading."

*People v.* Williams, 212 A.D.2d 388 (1st Dep't 1996): Conviction reversed where prosecutor repeatedly ignored trial judge's ruling as to scope of questioning and argued on summation that defendant was guilty of other uncharged crimes.

*People v. Lantigua*, 228 A.D.2d 313 (1st Dep't 1996): Conviction reversed where prosecutor failed to disclose that eyewitness was with another person when she allegedly saw the crime.

*People v. Collins*, 173 Misc.2d 350 (Sup. Ct. Bronx County 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance abuse.

*People v. King*, 241 A.D.2d 329 (1st Dep't 1997): Conviction reversed where prosecutor delayed turning over *Rosario* material.

*People v. Mikel*, 710 N.Y.S.2d 70 (1st Dep't 1997): Conviction reversed where prosecutor failed to disclose that witness violated his cooperation agreement prior to trial by fleeing to Puerto Rico and when he returned, entered into a new cooperation agreement to cover the numerous felony charges stemming from his flight.

*People v. Ortega*, 241 A.D.2d 369 (1st Dep't 1997): Conviction reversed where, among other things, prosecutor failed to disclose the transcript of eyewitness's Grand Jury

rebuttal testimony until its existence was discovered mid-trial.

*People v. Olivero*, 272 A.D.2d 174 (1st Dep't 2000): Conviction reversed where, among other things, prosecutor "mischaracterized" evidence on summation.

*Morales v. Portuondo*, 165 F.Supp.2d 601 (S.D.N.Y. 2001): Convictions of two defendants unconditionally discharged based on prosecutor's failure to disclose key exculpatory evidence pointing to another perpetrator.

*Ramos v. City of New York*, 285 A.D.2d 284 (Sup. Ct. Bronx County 2001): Civil claim against the City of New York for malicious prosecution reinstated based on the Human Resource Administration's withholding of exculpatory evidence.

*Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002): Suppression of favorable, material evidence, that third party in custody in another jurisdiction had confessed to hiring hit man to kill shooting victim, was a *Brady* violation that required relief.

*Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002): On the last day of trial prosecution disclosed that an additional memo book from one of the police witnesses had not been turned over and was lost. Conviction reversed for counsel's ineffectiveness in waiving strong *Rosario* claim without reason.

*People v. Johnson*, 191 Misc.2d 105 (Sup. Ct. Bronx County 2002): Conviction set aside for *Brady* and *Rosario* violations.

*People v. Bruno*, Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction reversed where prosecutor withheld information casting doubt on the voluntariness of a confession.

*People v. LaPorte*, 306 A.D.2d 93 (1st Dept 2003): Conviction reversed where prosecutor impugned defense counsel's integrity and ridiculed defense.

*People v. Spruill*, 5 A.D.3d 318 (1st Dep't 2004): Conviction reversed where prosecutor's summation comments improperly inflamed jury's emotions.

*People v. Woods*, 9 A.D.2d 293 (1st Dep't 2004): Conviction reversed for *Crawford* errors at trial. The court also noted it was improper for prosecutor to have met with key witness alone in her office when that witness could have viewed confidential records related to the field.

*People v. Poventud*, 802 N.Y.S.2d 605 (Sup. Ct. Bronx County 2005): Conviction vacated and a new trial was ordered because of the prosecution's *Brady* and *Rosario* violations.

*People v. Aquilar*, 14 Misc.3d 1 (Sup. Ct. Bronx County 2006): Conviction reversed where prosecutor's comments on summation "exceeded the bounds of legitimate advocacy."

*People v. Garcia*, 46 A.D.3d 461 (1st Dep't 2007): Defendants were granted a new trial because of the "flagrant violation by the prosecutor of his constitutional and ethical obligations" in failing to disclose "significant impeachment evidence."

*People v. Henderson*, 50 A.D.3d 439 (1st Dep't 2008): Conviction affirmed, but court noted the state's belated disclosure of a police report was a *Rosario* violation, but "did not require reversal, since there was no reasonable possibility that timely disclosure would have altered the verdict."

*People v. Gonzalez*, 24 Misc.3s 1243(A) (Sup. Ct. Bronx County 2009): Conviction upheld, but defendant's motion to reopen suppression hearing on a *Brady* claim would have been granted if it had been made in a timely manner.

*People v. Davis*, 27 Misc.3d 1226 (A) (Sup. Ct. Bronx County 2010): The court granted defendant's motion to reargue finding that a lost police file contained *Brady* material.

*People v. Castro*, 29 Misc.3d 1226 (Cup. Ct. Bronx County 2010): The People committed a *Rosario* violation by failing

to preserve a summons (case was dismissed because there was no probable cause for arrest).

*People v. Carroll*, 28 Misc.3d 1211(A) (Sup. Ct. Bronx County 2010): The court found that the People's failure to give Mr. Carroll the arresting officer's *Miranda* warning sheet constituted a *Rosario* violation.

*People v. Waters*, 35 Misc. 3d 855 (Sup. Ct. Bronx County 2012): The court granted Mr. Waters a new trial for the prosecution's *Brady* violation--failure to disclose evidence affecting the credibility of the People's "main witness." The court noted that "the prosecutor's failure to disclose this information is inexcusable."

Plaintiff believes there are many additional unreported decisions -- such as the aforementioned cases *People v. Marquez* and *People v. Browder* -- which likewise have been dismissed based on prosecutorial misconduct by the BDAO. Such unreported decisions, presently in the possession of the BDAO and which will only become available to plaintiff through discovery, will provide further evidence of the BDAO's ongoing pattern of prosecutorial misconduct and the City's deliberate indifference to this serious problem.

177. Despite their knowledge of these policies, practices, customs, and usages the supervisory and policymaking officials of the City of New York, through the Bronx County District Attorney's Office, perpetuated and failed to take steps to terminate them, did not discipline or otherwise properly supervise the individual prosecutorial personnel who allowed and engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the offending practices and policies with a deliberate indifference to their effect on individual constitutional rights.

178.    In a 2011 case study of the Bronx County District Attorney's Office,

attorney Joel Rudin reported the following:

> …[T]his major urban prosecutor's office, employing nearly 400 prosecutors and one hundred support staff, has no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standard governing when such sanctions will be imposed, no written or formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors who have been cited for or are known to have engaged in improper behavior. Officials [at the Bronx County District Attorney's Office] could identify just one prosecutor since 1975 who, according to the Office's records, has been disciplined in any respect for misbehavior while prosecuting a criminal case.

Joel Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537, 544 (2011). Plaintiff also relies on the decision in *People v. Ramos*, 285 A.D.2d 284, 306 (1st Dept 2001), upholding the denial of summary judgment as to *Monell* claims, in which the court found that nine reported *Brady* violations presented in support of inadequate supervision claims sufficiently alleged a pattern of deliberate indifference.

179.    As a result of the above described policies, practices customs, and usages, Bronx County District Attorneys of the City of New York, including defendant ADA Takantzas, were led to believe that their prosecutorial misconduct would not be investigated or sanctioned, but would instead be tolerated and condoned.

180.    Defendant City, defendant Robert T. Johnson, and the BDAO knew to a moral certainty that the issue of district attorney prosecutorial misconduct would continue

to arise in the investigation and prosecution of criminal cases; that the history of prosecutorial misconduct at the BDAO demonstrated the need for further instruction, training, supervision, and discipline; and that continuing to allow and condone prosecutorial misconduct would cause constitutional injury to criminal defendants.

181. The wrongful policies, practices, customs, and usages complained of herein, demonstrated a deliberate indifference on the part of the policymakers of the City of New York, including chief BDAO policy maker Robert T. Johnson, to the constitutional rights of persons within the city, and were the direct and proximate cause of the violations of plaintiff's rights and the injuries and damages to plaintiff alleged herein.

### THIRD CAUSE OF ACTION
### (New York State Constitutional Violations)
### Against the Individual Defendants

182. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

183. Such conduct breached the protections guaranteed to plaintiff by the New York State Constitution, including but not limited to, Article I, Secs. 6, 8, 11, and 12, and including the following rights:

    a.  freedom from unreasonable search and seizure of his person and property;

    b.  freedom from arrest without probable cause;

    c.  freedom from use of excessive force;

    d.  freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, and of which wrongful detention plaintiff was aware and did not consent;

e. freedom from the lodging of false charges against him by police officers and prosecutors, including on information and belief, by some or all of the individual defendants;

f. freedom from malicious prosecution by police officers and prosecutors, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

g. freedom from deprivation of liberty without due process of law; and

h. rights to equal protection, privileges and immunities under the law.

184. The deprivation of plaintiff's rights under the New York State Constitution resulted in the injuries and damages set forth above.

### FOURTH CAUSE OF ACTION
### (False Arrest)
### Against the Individual Defendants

185. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

186. Acting under color of law, some of the individual defendants unlawfully arrested plaintiff without probable cause or other legal justification.

187. Acting under color of law, some of the individual defendants caused and/or knowingly failed to prevent plaintiff's unlawful arrest.

188. On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

189. As a result, plaintiff suffered the injuries and damages set forth above.

190. Additionally, defendants are liable for punitive damages.

## FIFTH CAUSE OF ACTION
### (False Imprisonment)
### Against the Individual Defendants

191.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

192.    On information and belief, some of the individual defendants wrongfully detained plaintiff and deprived him of his liberty without good faith, reasonable suspicion or other legal justification.

193.    Plaintiff was conscious of, and did not consent to, his confinement.

194.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

195.    As a result, plaintiff suffered the injuries and damages set forth above.

196.    Additionally, defendants are liable for punitive damages.

## SIXTH CAUSE OF ACTION
### (Malicious Prosecution)
### Against the Individual Defendants

197.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

198.    On information and belief, some of the individual defendants, acting under color of law, commenced and continued, and/or caused to be commenced and continued, criminal prosecution against plaintiff that was lacking in probable cause, was instituted in malice, and ultimately terminated in plaintiff's favor.

199.    On information and belief, the individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights.

200.    As a result, plaintiff suffered the injuries and damages set forth above.

201.    Additionally, defendants are liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### (Respondeat Superior)
### Against Defendant City of New York

202.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

203.    Defendant City is liable for the actions of the individual defendants under the doctrine of respondeat superior.

204.    None of the individual defendants' actions described above were privileged or within the normal course of police activities.  None of the individual defendants is entitled to any immunity.

205.    Defendant City is liable for all damages suffered and incurred by plaintiff as a result of the individual defendants' actions described above.

**WHEREFORE**, plaintiff Francisco Nunez demands the following relief against all defendants, jointly and severally:

a.  a judgment declaring the actions and conduct of defendants unconstitutional and unlawful under federal and state law;

b.  expungement of all records relating to the plaintiff's arrests, including destruction of all photographs and fingerprints taken in connection with the arrests and prosecutions described above;

c.  full and fair compensatory damages in an amount to be determined by a jury;

d.  punitive damages, except against the City, in an amount to be determined by a jury;

e.  reasonable attorneys' fees, expenses, costs and disbursements of this

action;

f.  pre- and post-judgment interest; and

g.  such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       January 23, 2015

BELDOCK LEVINE & HOFFMAN LLP


By:  /s/Myron Beldock_____
Myron Beldock
Marc A. Cannan
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 490-0400

Avrom Robin
London & Robin
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 683-8000

*Attorneys for Plaintiff*