UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANCISCO NUNEZ,

                                  Plaintiff,

      -v-                                                    No. 14-cv-4182 (RJS)
                                                             OPINION AND ORDER
THE CITY OF NEW YORK, *et al.*,

                                  Defendants.

RICHARD J. SULLIVAN, District Judge:

      Plaintiff Francisco Nunez brings this action against Defendants the City of New York and

former and current employees of the City's Police Department and the Bronx District Attorney's

Office under 42 U.S.C. § 1983 and state law, alleging claims for false arrest, false imprisonment,

malicious prosecution, and excessive force.  Now before the Court is Defendants' motion to

partially dismiss the First Amended Complaint (Doc. No. 27 ("Amended Complaint" or "FAC"))

pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 30.)  For the reasons set forth

below, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND[1]

      This case arises from the arrest, prosecution, and three-year detention of Plaintiff for a

shooting that occurred in the Bronx on May 27, 2011.  (FAC ¶¶ 20–22.)  Specifically, that night,

two men shot into a crowd at 1171 Morrison Avenue, injuring three people, including a five year-

---

[1] For the purpose of this motion, the Court assumes that the facts alleged in the Amended Complaint are true and draws all reasonable inferences from those facts in Plaintiff's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court has also considered Defendants' brief in support of their motion (Doc. No. 32 ("Def. Br.")), Plaintiff's brief in opposition to the motion (Doc. No. 35 ("Pl. Opp.")), and Defendants' reply (Doc. No. 36 ("Reply")).

old girl.  (*Id.* ¶ 26.)  Immediately following the shooting, Brian Perez, an eyewitness, called 911 and reported the shooting, telling the operator that the shooters were two men with "long hair." (*Id.* ¶¶ 27–28.)  That night, a police radio broadcast described the perpetrators as two Hispanic men with long hair in a ponytail and no facial hair.  (*Id.* ¶¶ 31–32.)  Meanwhile, the three victims were taken to the hospital, where the police interviewed them and prepared complaint reports.  (*Id.* ¶ 48.)  These reports, like Perez's initial description to the police, described the perpetrators as "two male Hispanics who had long hair that was in a ponytail."  (*Id.* ¶ 49.)  By contrast, "at all [relevant] times," including shortly before and after the day of the shooting, Plaintiff "had a closely-cut, shaved Caesar style haircut and prominent beard."  (*Id.* ¶¶ 78; *see also id.* ¶¶ 96, 99.)

On May 28, 2011, Perez was "interrogated [by the police] about the . . . shooting for several hours" at the 43rd Precinct.  (*Id.* ¶ 47.)  According to the Amended Complaint, the police were aware then that "Perez had a criminal record, was on probation for criminal possession of a weapon, and was a known member of the gang Dominicans Don't Play."  (*Id.* ¶ 56.)  Moreover, the police already "suspected that the intended target of the May 27th shooting was Hector Lopez-Vega," one of the individuals injured in the shooting, "and that the incident was likely gang related" (*id.* ¶ 52), "perpetrated by members of the Trinitarios gang" against "members of their rival gang, Dominicans Don't Play" (*id.* ¶ 70).  Over the next ten days, Perez returned multiple times to the 43rd Precinct, where police further questioned him "in an effort to get him to identify" a suspect.  (*Id.* ¶ 74.)  Although Plaintiff alleges that the police obtained significant ballistic and fingerprint evidence related to the shooting (*id.* ¶¶ 60–62), he asserts that the "police did not obtain any further leads as to who the perpetrators were" (*id.* ¶ 66), and that on May 30, 2011, "in an attempt to obtain leads regarding the . . . shooting," the police began posting "Help us" flyers and

offered a $12,000 reward for information "leading to the arrest of the perpetrators of the . . . shooting" (*id.* ¶¶ 71–72).

While the NYPD's investigation was ongoing, Perez spoke to a friend, who showed him Facebook photos of Plaintiff and Ramon Ferreira and advised him that they were the two individuals "responsible for the May 27th shooting." (*Id.* ¶ 76.) At the time he was shown the photos, Perez "did not know" Ferreira or Plaintiff and "had never seen them before." (*Id.* ¶ 77.) Nevertheless, on June 2, 2011, the police showed Perez a photo array that included a photo of Ferreira, whereupon Perez identified Ferreira as one of the men he had seen shooting a gun on May 27. (*Id.* ¶¶ 79–80.) Later that day, "Ferreira was taken into custody." (*Id.* ¶ 82.) The next day, on June 3, 2011, Assistant District Attorney ("ADA") Cleopatra Takantzas "and/or other members" of the Bronx District Attorney's Office interrogated Ferreira and asked him whether he "associated with" Plaintiff. (*Id.* ¶¶ 90–91, 93.) Ferreira responded that "he knew" who Plaintiff was, but "he did not know" or "associate with" Plaintiff "personally." (*Id.* ¶ 94.)

On June 8, 2011, Perez identified Plaintiff in a photo array as the second May 27 shooter. (*Id.* ¶ 97.) The photo of Plaintiff was from April 26, 2011, and "depicted [him] with a closely-cut, shaved Caesar style haircut and prominent, fully grown beard." (*Id.* ¶¶ 95–96.) Two days later, on June 10, 2011, Plaintiff was taken to the 43rd Precinct, where he was detained for approximately ten hours, handcuffed to a wall, and questioned by "several different detectives," including NYPD Detective Damian Diedrick. (*Id.* ¶¶ 98–116.) During the interview, Plaintiff advised Diedrick "that all he knew about the May 27th shooting was what he had seen on the news and that he had been hanging out with his friends in a different neighborhood at the time of the shooting." (*Id.* ¶ 103.) Notwithstanding this denial, Diedrick "got aggressive and yelled at [P]laintiff that the girl who had been shot could have been [Diedrick's] daughter" (*id.* ¶ 109); he then "physically abused"

Plaintiff "by grabbing him by the neck and throwing him against the wall several times" (*id.* ¶ 110). Later that evening, Plaintiff "was placed in a lineup arranged by . . . Diedrick," at which time Perez again identified Plaintiff as one of the May 27 shooters. (*Id.* ¶ 117.) Notwithstanding the discrepancies between Plaintiff's physical appearance and the description of the shooters provided by eyewitnesses on the night of the shooting, none of the other witnesses to the shooting were asked to participate in the lineup. (*See id.* ¶ 118.) Shortly after the lineup, Plaintiff was "taken to Central Booking," charged "with three attempted murders" in connection with the shooting, arraigned on those charges, denied bail, and detained at Rikers Island. (*Id.* ¶¶ 119–21.) On September 7, 2011, Takantzas presented the people's case against Plaintiff to a grand jury, which returned an indictment against Plaintiff on multiple serious counts, including for attempted murder. (*Id.* ¶ 135.) According to the Amended Complaint, the "only information presented" to the grand jury connecting Plaintiff to the May 27th shooting "was the testimony of . . . Perez identifying [P]laintiff as one of the perpetrators of that crime." (*Id.* ¶ 136.)

Meanwhile, on July 16, 2011, prior to Plaintiff's indictment, "Perez was arrested for criminal possession of a weapon in the second degree" and was convicted of that charge on October 7, 2011. (*Id.* ¶ 130.) On March 14, 2012, Perez "was released from custody" in connection with that conviction (*id.* ¶ 146), and on March 31, 2012, Perez informed Plaintiff's defense counsel that his identification of Plaintiff was "not accurate or reliable" (*id.* ¶ 148). On April 5, 2012, Plaintiff's counsel relayed this information to Takantzas, who nevertheless continued to pursue the criminal case against Plaintiff. (*Id.* ¶¶ 149, 156.) On May 11, 2012, Plaintiff's application for bail was denied. (*Id.* ¶¶ 156–58.) On September 9, 2013, Perez "was arrested for criminal possession of marijuana and criminal possession of a controlled substance." (*Id.* ¶ 160.) On April 9, 2014, Perez was arrested again – this time, for an October 2013 "murder and for criminal possession of a loaded

4

firearm" – and on May 9, 2014, he was indicted on those charges.  (*Id.* ¶ 162.)  On May 6, 2014 –
just three days before Perez was indicted and almost "three years after" Plaintiff's arrest for the
May 27, 2011 shooting – "all charges" against Plaintiff "were dismissed" on a motion filed by the
Bronx District Attorney's Office.  (*Id.* ¶ 163.)

On June 10, 2014, Plaintiff commenced this action by filing an initial complaint (Doc. No.
2), and on January 23, 2015, he filed the Amended Complaint (Doc. No. 27) alleging claims for
false arrest, false imprisonment, excessive force, and malicious prosecution against Defendants
the City of New York (the "City"); former and current employees of the New York City Police
Department (the "NYPD"), specifically, Lieutenant John Rogan and Detectives Damian Diedrick,
Cliff Acosta, Rene Narvaez, and Steve Alejandro (collectively, the "NYPD Defendants"); Bronx
District Attorney Robert Johnson and Assistant District Attorney Cleopatra Takantzas
(collectively, the "DA Defendants," and with the NYPD Defendants, the "Individual Defendants,"
and with the City, "Defendants").[2]  On March 9, 2015, Defendants filed a motion to partially
dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6).  (Doc. No. 30.)  Defendants' motion was fully briefed as of April 23, 2015.
(*See* Doc. Nos. 31, 32, 35, 36, 37.)

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "provide the grounds
upon which [the] claim rests."  *ATSI Commc'ns, Inc.*, 493 F.3d at 98.  To meet this standard, a
plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff

---

[2] In addition, the Amended Complaint names an unspecified number of "John and Jane Does" and "Richard and Rachel
Roes" (collectively, the "Unknown Defendants"), who are police officers and supervisors whose identities are
currently unknown and who have not yet been served, or filed notices of appearance, in this action.

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *ATSI Commc'ns*, 493 F.3d at 98.  That tenet, however, "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed."  *Id.* at 570.

### III.  DISCUSSION

#### A.  § 1983 Claims Against the Individual Defendants

"To state a claim under § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."  *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).  As noted above, the unlawful conduct alleged here includes claims for false arrest, excessive force, and malicious prosecution.  Such claims, whether brought under § 1983 or under state law, are analyzed pursuant to the same standards as the applicable state law tort.  *See Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015); *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).  The Court will address each in turn.

##### 1.  False Arrest[3]

Defendants argue that Plaintiff's § 1983 false arrest claim should be dismissed on qualified immunity grounds as to the NYPD Defendants and on absolute immunity grounds as to the DA

---

[3] The Court analyzes Plaintiff's false arrest and false imprisonment claims as a single claim (the "false arrest claim"), since the "they are considered synonymous causes of action" under New York law.  *See Little v. City of New York*, 487 F. Supp. 2d 426, 437 (S.D.N.Y. 2007) (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)).

Defendants, and, with respect to certain of the Individual Defendants, for failure to plead their personal involvement in Plaintiff's arrest.  (Def. Br. at 8–12, 15–18.)

Under New York law, a plaintiff bringing a claim for false arrest must allege that:  "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *See Nzegwu*, 605 F. App'x at 29 (citing *Jocks*, 316 F.3d at 134–35).  "Privilege may be established by showing the existence of probable cause for the arrest or detainment."  *Simmons v. Kelly*, No. 06-cv-6183 (RJS), 2009 WL 857410, at *4 (S.D.N.Y. Mar. 31, 2009) (citing *Jocks*, 316 F.3d at 135).  Therefore, "[u]nder New York law, probable cause to arrest is a complete defense to a claim of false arrest."  *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (probable cause is a complete defense to a false arrest claim, "whether that [claim] is brought under state law or under § 1983").

"Although the existence of probable cause must be determined with reference to the facts of each case, in general '[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'"  *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)).  Courts must determine "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).  While "probable cause does not require absolute certainty," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (brackets omitted), it still must "rest on 'more than rumor, suspicion, or even a strong reason to suspect,'" *Williams v. City of New York*, No. 10-cv-2676 (JG) (LB), 2012 WL 511533,

at *2 (E.D.N.Y. Feb. 15, 2012) (internal quotation marks omitted) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)).   Thus, although a police officer does not have a duty to investigate exculpatory defenses offered by a defendant, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Manganiello*, 612 F.3d at 161 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). Particularly relevant here is the rule that, although a law enforcement official generally "has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," probable cause does not exist where "*the circumstances raise doubt as to the person's veracity*."  *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (emphasis added); *see also Stansbury v. Wertman*, 721 F.3d 84, 90–91 (2d Cir. 2013) ("[A]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause." (internal quotation marks omitted)).   "The same rule applies to identifications of the perpetrator from photographic arrays."  *Stansbury*, 721 F.3d at 91 n.5 (citing *People v. Jones*, 2 N.Y.3d 235, 238 (2004)).

However, even if an arrest is made without probable cause, dismissal of a false arrest claim may still be warranted on the grounds of qualified immunity – which is also "a complete defense to false arrest claims," *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012) – if the police officer defendant can establish that he had "arguable probable cause" to arrest the plaintiff. *See Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Ackerson*, 702 F.3d at 21.  "In this respect, the qualified immunity test is more favorable to the officers than the one for probable cause."  *Id.* (internal quotation marks omitted).  "The test is not

toothless, however: 'If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.'" *Id.* (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

"Because qualified immunity is an affirmative defense, defendants bear the burden of showing that there was arguable probable cause." *Gaston v. City of New York*, 851 F. Supp. 2d 780, 795 (S.D.N.Y. 2012) (collecting cases). "On a motion to dismiss, . . . a qualified immunity defense based on arguable probable cause 'faces a formidable hurdle . . . and is usually not successful.'" *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 375 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)); *see, e.g.*, *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002) (finding that "a ruling on the availability of a qualified immunity defense would be premature" because "[t]he qualified immunity issue . . . turn[ed] on factual questions that [could ]not be resolved" on a Rule 12(b)(6) motion. As the Second Circuit has explained, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route"; thus, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, . . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citation omitted).

Significantly, in this case, Defendants do not even attempt to argue that there was probable cause for Plaintiff's arrest. Rather, Defendants assert that there was "arguable probable cause" to arrest Plaintiff based on Perez's June 2011 identifications. (Def. Br. at 16–17.)

9

a.  NYPD Defendants

As an initial matter, the Court considers whether Plaintiff has pled that the NYPD Defendants were personally involved in Plaintiff's arrest, since "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to a claim under § 1983.  *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).

Here, other than with respect to Detective Diedrick, Plaintiff's Amended Complaint fails to specifically allege that the NYPD Defendants were personally involved in Plaintiff's arrest.  At most, the Amended Complaint alleges that the non-Diedrick NYPD Defendants were involved in parts of the investigation of the May 27 shooting that ultimately resulted in Plaintiff's arrest.  For example, Plaintiff alleges that Acosta prepared a photo array "which contained an April 26, 2011 police photograph of [P]laintiff" (FAC ¶ 95), that Narvaez "conferred with the Bronx Gang Squad regarding the May 27, 2011 shooting" (*id.* ¶ 53), that Alejandro interviewed a witness to the shooting (*id.* ¶ 40), and that Rogan "was in charge of the other officers and giving out orders" (*id.* ¶ 30.).  The Amended Complaint also alleges conduct by unspecified groups of "detectives," without naming any of the NYPD Defendants.  *See, e.g.*, *id.* ¶¶ 100–01 ("three detectives . . . asked [P]laintiff for his name" and then "told [P]laintiff to come with them because they wanted to ask him questions"); *id.* ¶ 104 ("Plaintiff was interrogated for several hours by several different detectives . . . .").  Nowhere does the Amended Complaint indicate which officers, other than Diedrick, were involved in the arrest of Plaintiff on June 10, 2011.  Clearly, such vague, group pleading is insufficient to trigger false arrest liability under § 1983.  *See, e.g.*, *Bouche v. City of Mount Vernon*, No. 11-cv-5246 (SAS), 2012 WL 987592, at *8 (S.D.N.Y. Mar. 23, 2012) (granting defendants' motion to dismiss § 1983 claim because "the [c]omplaint d[id] not . . . adequately establish [the defendants'] alleged personal involvement" in the underlying

constitutional violation).  Accordingly, except as to Diedrick, the Court dismisses Plaintiff's false arrest claim against the NYPD Defendants.

Detective Diedrick, on the other hand, is identified as having participated in the June 10, 2011 interrogation of Plaintiff.  The Amended Complaint alleges that Diedrick questioned Plaintiff while Plaintiff "had one arm handcuffed to the wall" and that Diedrick "got aggressive and yelled at [P]laintiff" and "physically abused [P]laintiff by grabbing him by the neck and throwing him against the wall several times" during the interrogation.  (FAC ¶¶ 109–12.)  Since Defendants do not dispute at this stage the lack of probable cause for Plaintiff's arrest, the Court only considers whether this claim must nevertheless be dismissed against Diedrick on qualified immunity grounds.  To establish a qualified immunity defense, Diedrick must show that it was "objectively reasonable" for him to detain Plaintiff on June 10, 2011 based on the evidence that Diedrick knew at that time.  *Ackerson*, 702 F.3d at 21.  Plaintiff alleges that on June 10, 2011, the only evidence connecting him to the May 27, 2011 shooting was Perez's June 8, 2011 and June 10, 2011 identifications of Plaintiff.  (FAC ¶¶ 97, 117, 124.)  Although positive identification of a suspect by an eyewitness might ordinarily be sufficient to justify an arrest, *see Fabrikant*, 691 F.3d at 216; *Stansbury*, 721 F.3d at 90–91 & n.5, the facts alleged in the Amended Complaint, which are assumed true at this stage of the proceedings, suggest that Diedrick had reason to doubt Perez's credibility in making these identifications.  First, the Amended Complaint asserts several stark differences between Plaintiff's physical appearance and the descriptions of the shooters that eyewitnesses – including Perez – provided to the police immediately after the shooting.  (*Compare* FAC ¶ 32 ("[b]oth perpetrators were described as having long hair that was in a ponytail and no facial hair"), *with id.* ¶ 78 (alleging that Plaintiff had "a closely-cut, shaved Caesar style haircut and prominent beard" at all relevant times).)  Second, while Perez first described the shooters on

11

his 911 call immediately after the shooting as having "long hair" (*id.* ¶¶ 27–28), Perez's identification in June 2011 of Plaintiff, who had short hair, came ten days after the shooting and on the heels of extensive police interrogation (*id.* ¶¶ 95–97).  Third, Perez has a criminal record, was on probation, and was affiliated with the gang targeted by the shooting.  (*Id.* ¶ 56.) Collectively, these alleged facts, and the inferences they raise concerning Perez's questionable motives, should have "raise[d] doubt as to [Perez's] veracity," *Fabrikant*, 691 F.3d at 216, and they call into question whether it was "objectively reasonable" to believe that Plaintiff was the shooter, *Ackerson*, 702 F.3d at 21; *see also Sital v. City of New York*, 60 A.D.3d 465, 466 (2009) ("a rational jury could have found that there was no probable cause for plaintiff's arrest because the accusation from [a witness], which was the sole basis for the arrest, was not sufficiently reliable, given that the investigating officer had doubts about the witness's credibility").  For these reasons, the Court finds that "any ruling regarding the availability of a qualified immunity defense" for Plaintiff's false arrest claim as to Diedrick "would be premature at this time," *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004), and therefore denies Defendants' Rule 12(b)(6) motion to dismiss this claim against Diedrick on qualified immunity grounds.

### b.  DA Defendants

The DA Defendants argue that the false arrest claims against them should be dismissed for failure to plead personal involvement and on absolute immunity grounds.  (Def. Br. at 10–12.)

The Court agrees that the Amended Complaint fails to allege any facts to suggest that Defendant Bronx District Attorney Robert Johnson was personally involved in Plaintiff's arrest and pre-arraignment detention.  In fact, Johnson is named in this action in his "official capacity" only, and as such, he is not a "person" capable of being sued for damages under § 1983 for alleged constitutional violations that occurred in connection with Plaintiff's prosecution.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("a state official sued in his official

capacity is [not] a 'person' within the meaning of" § 1983); *see also Reid v. Schuman*, 83 F. App'x 376, 377 (2d Cir. 2003) ("when a District Attorney is prosecuting a criminal matter, she represents the State, not the municipality," and therefore, to the extent a plaintiff "seeks damages against [a DA] in her official capacity," such an action "constitutes an impermissible suit against the State"). Accordingly, the Court dismisses Plaintiff's false arrest claim as to Johnson for failure to state a claim on which relief can be granted.

As to Takantzas, although she is being sued in her individual capacity, the Amended Complaint similarly fails to plead any facts suggesting that she was personally involved in the decision to arrest Plaintiff or to detain him pre-arraignment.  To the contrary, the Amended Complaint merely alleges that Takantzas interviewed Ferreira on June 3, 2011 (FAC ¶ 91), prior to Plaintiff's arrest, and then examined Ferreira before the grand jury on June 13, 2011 (*id.* ¶¶ 125– 27).  Therefore, the Court also dismisses Plaintiff's false arrest claim as to Takantzas.

### 2.  Excessive Force

Although Plaintiff brings excessive force claims against all of the Individual Defendants, the Amended Complaint is once again devoid of any facts alleging personal involvement by any of the Individual Defendants except Diedrick.  Accordingly, the Court dismisses Plaintiff's excessive force claim against the Individual Defendants, other than Diedrick, who has not moved to dismiss this claim.

### 3.  Malicious Prosecution

For Plaintiff to prevail on his § 1983 malicious prosecution claim, he "must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law."  *Manganiello*, 612 F.3d at 161 (citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the

proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)); *see also Broughton v. State of New York*, 37 N.Y.2d 451, 457 (1975). As with a false arrest claim, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution," *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003), and essentially the same standard as the one set forth above for a false arrest claim applies to a determination of probable cause in the malicious prosecution context, *see Gaston*, 851 F. Supp. 2d at 793.

### a. NYPD Defendants

Defendants move to dismiss the malicious prosecution claim against the NYPD Defendants on the ground that they were not involved "in the initiation of the prosecution against Plaintiff." (Def. Br. at 13.) "Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010). Other than with respect to Diedrick, the Court agrees that Plaintiff's malicious prosecution claim fails because the Amended Complaint is devoid of any factual allegations that suggest that any of the other NYPD Defendants were involved in initiating Plaintiff's prosecution. Accordingly, the Court dismisses Plaintiff's malicious prosecution claim as to all the NYPD Defendants – except Diedrick – for failure to state a claim on which relief can be granted.

By contrast, although the Amended Complaint does not specifically name the individual responsible for formally filing the criminal charges against Plaintiff, the Court finds that Plaintiff has nevertheless pleaded sufficient facts that would allow the Court to reasonably conclude that it was Diedrick. Specifically, the Amended Complaint alleges that on June 10, 2011, Diedrick interrogated Plaintiff and arranged the lineup at which Perez identified Plaintiff, which immediately preceded Plaintiff's being "taken to Central Booking," where he was charged and then arraigned. (FAC ¶¶ 117, 119–21.) Moreover, Plaintiff asserts in his opposition brief that it

was Diedrick who "formally charged [Plaintiff] by filing a criminal court complaint against him and having him arraigned," and Plaintiff attaches as an exhibit to the brief a copy of the criminal complaint.  (Pl. Opp. at 15; *id.* Ex. B.)  Defendants do not dispute this assertion or the authenticity of Plaintiff's new exhibit.  Instead, Defendants argue that because Plaintiff failed to plead this fact in his Amended Complaint and raises it for the first time in his brief, the Court should not consider it.  (Reply at 3–4.)  However, even without the new exhibit, the chronology alleged in the Amended Complaint, with all reasonable inferences drawn in Plaintiff's favor, is sufficient at this stage to plead Diedrick's personal involvement in "initiating" Plaintiff's prosecution.  Thus, the Court declines to dismiss the malicious prosecution claim against Diedrick on this ground.

With respect to the remaining elements of a malicious prosecution claim, there is no dispute that the dismissal of the charges against Plaintiff constitutes a favorable termination of the charges in satisfaction of the second element, and that the third element – lack of probable cause or arguable probable cause – is met for the same reasons discussed above with respect to the false arrest claim. *See Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) (applying "the same [probable cause] standard . . . to evaluate qualified immunity" for false arrest and malicious prosecution claims); *see also Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004) ("The existence or nonexistence of probable cause in a malicious prosecution suit . . . . is determined, at the earliest, as of the time prosecution is commenced.").  To be sure, the fact that Plaintiff was indicted by a grand jury gives rise to "a presumption that the prosecution of [Plaintiff] was supported by probable cause." *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003) (citing *Colon*, 60 N.Y.2d at 82).  However, this presumption can be overcome with "evidence that the indictment was secured by fraud, perjury, the suppression of evidence or other bad faith police conduct." *Id.* (citing *Colon*, 60 N.Y.2d at 83).  At this preliminary stage, drawing all reasonable inferences in Plaintiff's favor, the

Court finds that the Amended Complaint's allegations of mounting pressure to identify the shooter, the lack of leads, the highly suspicious circumstances surrounding Perez's identification of Plaintiff, the obvious exculpatory evidence regarding the shooters' appearances as compared to Plaintiff's, and Diedrick's hostility toward, and use of force against, Plaintiff reasonably support an inference that "the indictment was secured through bad faith," *id.*, thus rebutting the presumption of probable cause created by the indictment, *see generally Anilao*, 774 F. Supp. 2d at 506 ("at the motion to dismiss stage, the . . . defendants cannot hide behind the decision of the DA to prosecute and the subsequent indictment of plaintiffs when it was the . . . defendants who allegedly spurred the [prosecutors] to act," including by feeding them "with false testimony").

Accordingly, the Court finds that Plaintiff has stated a plausible § 1983 claim for malicious prosecution against Diedrick.

### b.  DA Defendants

As an initial matter, the Court dismisses Plaintiff's malicious prosecution claim against Johnson for the same reasons set forth above with respect to the false arrest claim.

As for Takantzas, the Court agrees with Defendants that she is immune from Plaintiff's malicious prosecution claim.  (Def. Br. at 10–11.)  The doctrine of absolute prosecutorial immunity "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that 'prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'"  *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) (quoting *Burns*, 500 U.S. at 486); *see also Shmueli v. City of New York*, 424 F.3d 231, 238 (2d Cir. 2005) (absolute immunity also applies to state law claims).  Thus, a "prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an

improper state of mind or improper motive." *Shmueli*, 424 F.3d at 237. A defendant may raise the defense of absolute immunity in a motion to dismiss, so long as "the nature of the function being performed by the defendant official . . . [is] clear from the face of the complaint." *Id.* at 236.

Here, Plaintiff's malicious prosecution claim takes aim at Takantzas's decision to pursue and prosecute the charges against Plaintiff for the May 2011 shooting despite the absence of evidence against him. All of the allegations underlying this claim as to Takantzas concern her alleged misconduct in connection with the grand jury and subsequent court proceedings, including her alleged failure to disclose *Brady* and other exculpatory evidence. These allegations – all of which involve conduct that occurred after Plaintiff was arrested and charged for the May 2011 shooting – "clearly relate to the judicial phase of the criminal process," and therefore fall within the scope of the doctrine of absolute immunity. *Stewart v. City of New York*, No. 10-cv-5628 (RJS), 2011 WL 1532007, at *3 (S.D.N.Y. Apr. 18, 2011); *see Buckley v. Fitzsimmons*, 509 U.S. 259, 290 n.5 (1993) (absolute immunity applies to "a prosecutor's decision to bring an indictment, whether he has probable cause or not"); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ("we . . . have consistently stated that prosecutors are immune from § 1983 liability for their conduct before a grand jury," including for "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" and "deliberately suppressing *Brady* material"). Accordingly, while the Court notes that Plaintiff has stated a malicious prosecution claim against Takantzas that essentially mirrors the claim as to Diedrick, the Court finds that this claim must nevertheless be dismissed as to Takantzas on the ground of absolute prosecutorial immunity.[4]

---

[4] To the extent that Plaintiff also argues that he was unreasonably detained while awaiting trial as a result of Takantzas' decision to prosecute Plaintiff, the Court finds that Plaintiff's prolonged pretrial detention does not alter the absolute immunity analysis, since a prosecutor's decision to oppose bail under these circumstances is also part of the judicial process and within the scope of a prosecutor's traditional functions. *See Stewart*, 2011 WL 1532007, at *4 n.7; *see also Pinaud*, 52 F.3d at 1149 ("[A]ctions in connection with a bail application are best understood as components of the initiation and presentation of a prosecution, and therefore are protected by absolute immunity.").

B. *Monell* Claim

Plaintiff also claims that, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City, through the Bronx District Attorney's Office, is vicariously liable for Plaintiff's malicious prosecution.  (FAC ¶¶ 167–81.)

To state a *Monell* claim against a municipality, a plaintiff must allege:  "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted).  As these elements indicate, *Monell* does not provide a separate cause of action against a local government for violations under § 1983.  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  Rather, "it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to" – that is, caused – an underlying "constitutional violation."  *Id.*  Under *Monell*, "to ensure that a municipality is not held liable solely for the actions of its employee, courts must apply rigorous standards of culpability and causation."  *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05-cv-6278 (RJS), 2009 WL 804096, at *21 (S.D.N.Y. Mar. 25, 2009) (citation omitted).

In this case, Plaintiff alleges in conclusory terms that the City, through the Bronx District Attorney's Office, "directly caused" the "constitutional violations" that Plaintiff "suffered as a result" of his malicious prosecution by "encouraging and/or tacitly sanctioning" "unconstitutional conduct" by Bronx ADAs through the City's alleged failure to adequately train Bronx ADAs on, or discipline them for violations of, a criminal defendant's constitutional rights.  (FAC ¶¶ 168, 170.)  "The failure to train or supervise city employees" may "constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."  *Wray*, 490 F.3d at 195 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "This version of *Monell* liability is a rather narrow category," however.  *Richardson*,

2009 WL 804096, at *22 (internal quotation marks omitted). Thus, "mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are inadequate to demonstrate the existence of such a custom unless supported by factual details." *Prado v. City of New York*, No. 12-cv-4239 (RJS), 2015 WL 5190427, at *6 (S.D.N.Y. Sept. 3, 2015). "[A] single incident involving an employee below the policymaking level" is similarly inadequate. *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004) (citing *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995)).

Here, the only constitutional violation that could potentially give rise to Plaintiff's *Monell* claim is his malicious prosecution claim as to Takantzas, which, as the Court found above, states a claim for relief but is barred on absolute immunity grounds.[5] Even assuming that such a claim can provide the underlying constitutional deprivation for Plaintiff's *Monell* claim, the Court finds that Plaintiff has failed to allege any facts that would allow the Court to reasonably conclude that the City failed to adequately train or discipline its prosecuting attorneys regarding a criminal defendant's constitutional rights. Specifically, in support of his conclusory assertions, Plaintiff offers a list of forty-seven cases spanning over two decades (from 1989 to 2012) involving prosecutorial misconduct by ADAs in the Bronx District Attorney's Office. (*See* FAC ¶ 176.) The Amended Complaint provides no comparable survey of favorable decisions, or any other context for evaluating the statistical significance of the cases listed. The Court concludes that Plaintiff's identification of approximately two unfavorable decisions per year over a twenty-three-year period fails to support a reasonable inference of a practice of prosecutorial misconduct that either (1) is "so consistent and widespread" that it constitutes a "custom" of the Bronx District Attorney's

---

[5] As noted above, Plaintiff's *Monell* claim is premised solely on the misconduct of the Bronx District Attorney's Office, not the NYPD. (*See* FAC ¶ 168, 170.)

Office, or (2) evinces a failure of training or supervision so extensive "that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Tieman v. City of Newburgh*, No. 13-cv-4178 (KMK), 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)); *cf. id.* at *17 ("Simply put, the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom."); *Jovanovic v. City of New York*, No. 04-cv-8437 (PAC), 2010 WL 8500283, at *15 (S.D.N.Y. Sept. 28, 2010) (finding that plaintiff failed to allege "that the District Attorney's Office had an improper policy or custom" by merely pointing to other cases involving alleged prosecutorial misconduct because in light of the "myriad convictions" that the DA's Office "obtained" in the 1990s, the "small number of cases" cited by Plaintiff was "insufficient to establish that the DA's Office was on notice of its allegedly deficient training or that these deficiencies [were] the result of deliberate indifference"), *aff'd*, 486 F. App'x 149 (2d Cir. 2012).

Indeed, the specific conduct at issue in the cases listed is, for the most part, wholly irrelevant to the alleged constitutional violation at issue here.  (*See, e.g.*, FAC ¶ 176 (citing cases overturning criminal convictions for a "prosecutor's improprieties on summation," a "prosecutor [who] denigrated defense theory of self-defense," a "prosecutor's inflammatory comments," a prosecutor who "violat[ed] the Code of Professional Responsibility" in connection with his summation, a prosecutor who was "admonished regarding his summation and *directed to receive training in order to refrain from future improper conduct*" (emphasis added)); *id.* (citing case *affirming* conviction where alleged misconduct was that prosecutor "improperly characterized

defendant as a 'magician'".)  The Court finds that this grab bag of criminal cases involving dissimilar prosecutorial misconduct fails to support an inference of deliberate indifference on the part of the City with respect to the specific misconduct alleged here.  *Cf. Connick v. Thompson*, 563 U.S. 51, 62–63 (2011) (conviction reversals due to *Brady* violations not sufficiently "similar to the violation at issue" and "could not have put [defendant] on notice that specific training was necessary" because, unlike the alleged violations, they did not "involve[] failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind"); *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (plaintiff's citation of "litany of other police-misconduct cases" was "insufficient to make a plausible case for *Monell* liability" because the cases were different than the alleged misconduct, post-dated the alleged misconduct, or "involve[d] something less . . . than evidence of misconduct").

Accordingly, the Court dismisses Plaintiff's *Monell* claim against the City for failure to state a claim on which relief can be granted.

## C.  State Law Claims

As noted above, Plaintiff's claims against the Individual Defendants under state law "are analyzed pursuant to the same standards" as his § 1983 claims.  *See Nzegwu*, 605 F. App'x at 29; *Jocks*, 316 F.3d at 134.  Moreover, the principles of absolute prosecutorial immunity in the § 1983 context "also protect a prosecutor against malicious prosecution claims brought under state law." *Shmueli*, 424 F.3d at 238; *see, e.g.*, *Rudow v. City of New York*, 822 F.2d 324, 329 (2d Cir. 1987); *Schanbarger v. Kellogg*, 35 A.D.2d 902, 902 (N.Y. App. Div. 1970), *appeal dismissed*, 29 N.Y.2d 649 (1971); *see also Imbler v. Pachtman*, 424 U.S. 409, 424 (1976) (same principles require conferral of absolute immunity for damages claims under § 1983 and state law).  Accordingly, the Court dismisses these state law claims against the Individual Defendants – except as to Diedrick – for the same reasons set forth above with respect to Plaintiff's parallel § 1983 claims.

Finally, Defendants argue that the Court should dismiss Plaintiff's state law claims, seemingly as to all Defendants, for failure to comply with New York's notice-of-claim requirement pursuant to N.Y. Gen. Mun. L. § 50-i(1)(b).  (Def. Br. at 25.)  The Court agrees, but only with respect to the state law claims against *the City*, since this requirement does not apply to non-municipal defendants.  Under New York law, "[s]ervice of a notice of claim . . . is a condition precedent to a lawsuit against a municipal corporation."  *Davidson v. Bronx Mun. Hosp.*, 64 N.Y.2d 59, 61 (1984).  Pursuant to N.Y. Gen. Mun. L. § 50-i(b), a plaintiff "must not only plead in his complaint that he has served a notice of claim, but must also allege that the notice was served at least 30 days prior to commencement of the action and that in that time defendants neglected to or refused to adjust or to satisfy the claim."  *Id.* at 61–62; *see also Faruki v. City of New York*, No. 10-cv-9614 (LAP), 2012 WL 1085533, at *10 (S.D.N.Y. Mar. 30, 2012), *aff'd*, 517 F. App'x 1 (2d Cir. 2013).  "Notice of claim requirements are construed strictly," and "[f]ailure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action," *Faruki*, 2012 WL 1085533, at *9, "even if the claim is meritorious," *PBS Bldg. Sys., Inc. v. City of New York*, No. 94-cv-3488 (JGK), 1996 WL 583380, at *3 (S.D.N.Y. Oct. 10, 1996); *see also Davidson*, 64 N.Y.2d at 62.  Here, Plaintiff not only fails to allege compliance with New York's notice-of-claim requirement in the Amended Complaint, but in fact concedes that he served his notice of claim on the City on the same day that he commenced this action by filing the initial complaint.  (*See* Doc. No. 2; FAC ¶ 17.)  Accordingly, the Court dismisses Plaintiff's state law claims against the City, including the *respondeat superior* claim, for failure to state a claim on which relief can be granted.  *See, e.g.*, *Sheil v. Melucci*, 94 A.D.3d 766, 768 (2012) (dismissing action where plaintiff served notice on defendant "on the same day as she commenced [a] CPLR article 78 proceeding" and therefore "did not – and could not – allege in the petition that 30 days

had elapsed since the service of the notice of claim"); *Smith v. Scott*, 294 A.D.2d 11, 22 (2002) (dismissing action against city for failure to plead compliance with New York's notice requirement); *see also Horvath v. Daniel*, 423 F. Supp. 2d 421, 424–25 (S.D.N.Y. 2006) (federal courts "lack authority to permit [a] plaintiff to file a late Notice of Claim").

IV. Conclusion

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) with respect to all of Plaintiff's claims except the false arrest and malicious prosecution claims against Diedrick.  In addition, since Defendants have not moved to dismiss the excessive force claim against Diedrick, that claim also survives.

Accordingly, IT IS HEREBY ORDERED THAT, by April 29, 2016, the remaining parties in this action shall submit a letter to the Court proposing next steps and attaching a revised proposed case management plan and scheduling order.  A template for the order is available at: http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=1059.  The Clerk of the Court is respectfully directed to terminate the motion pending at docket entry 30.

SO ORDERED.

Dated:      March 31, 2016
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/31/16_